# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

No. 16-60068

August 11, 2017

Lyle W. Cayce
Clerk

BC RANCH II, L.P., also known as Bosque Canyon Ranch II, L.P.; BC RANCH I, INCORPORATED, Tax Matters Partner,

Petitioners - Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

-----------------------------------------------

Cons w/16-60069

BOSQUE CANYON RANCH, L.P.; BC RANCH, INCORPORATED, Tax Matters Partner,

Petitioners - Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

Appeals from the Decision of the
United States Tax Court

No. 16-60068
Cons. w/ 16-60069

Before WIENER, DENNIS, and HAYNES, Circuit Judges.

WIENER, Circuit Judge:

Petitioners-Appellants, BC Ranch I, L.P. ("BCR I"), and B.C. Ranch II, L.P. ("BCR II"), (collectively the "BCR Partnerships" or "Appellants"), claim that Respondent-Appellee, the Commissioner of Internal Revenue (the "Commissioner"), wrongfully disallowed their charitable deductions for two conservation easements. Appellants contend that in ruling for the Commission, the Tax Court wrongfully classified the sale of limited partnership interests as disguised sales and wrongfully imposed a gross valuation misstatement penalty. We vacate and remand.

I.

FACTS AND PROCEEDINGS

A.    Factual Background

In 2003, BCR I, purchased a 3,744 acre tract of land called Bosque Canyon Ranch (the "ranch"). On December 20, 2005, BCR I conveyed approximately 1,866 acres of the ranch to BCR II.

1. The Conservation Easements

Beginning in 2003, the ranch developers worked with North American Land Trust ("NALT") to determine if the ranch would qualify for a tax-deductible conservation easement. NALT advised them that the ranch would qualify and that one benefit of such an easement would be to permanently protect the nesting areas and habitat of the gold-cheeked warbler, a listed endangered species.

Extensive documentation was assembled from NALT's various site visits, including photographs from a 2003 visit, an aerial photograph of the ranch, numerous property maps, details of the site visit of a NALT biologist,

2

No. 16-60068
Cons. w/ 16-60069

and maps of the gold-cheeked warbler habitat. On NALT's recommendation, the ranch hired Integrated Environmental Solutions ("IES") to consult on plant ecology and avian biology and to provide recommendations for how the property should be developed to ensure compliance with the Endangered Species Act. IES completed a report that included detailed aerial photographs and topographic maps depicting the habitat surveys conducted in April 2004 and December 2005, showing the gold-cheeked warblers' probable nesting areas. Ultimately, NALT and the BCR Partnerships assembled two binders of "baseline documents" detailing the conservation easements.

BCR I donated a conservation easement to NALT on December 29, 2005. BCR II donated a conservation easement to NALT on September 14, 2007. Both easements contained substantially identical terms. They protected and preserved (1) the habitat for the gold-cheeked warblers and other birds and game, (2) watershed, (3) scenic vistas, and (4) mature forest. The easements "voluntarily, unconditionally, and absolutely" granted NALT, its successors and assigns, "perpetual easement[s] in gross" over the conservation areas, subjecting the property to a series of "covenants and restrictions in perpetuity" that prohibit most residential, commercial, industrial, and agricultural uses. The easements reserved narrow rights to the grantors that NALT and the BCR Partnerships agreed "could be conducted . . . without having an adverse effect on the protected Conservation Purpose."

The easements could be amended only with NALT's consent and then only to modify the boundaries of the homesite parcels, but not to increase their areas above five acres. NALT continues to monitor the conservation area and has repeatedly found it to be in good condition and in compliance with the terms of the easements.

3

No. 16-60068
Cons. w/ 16-60069

2. The Limited Partnership Interests

Around February 2005, BCR I started to market limited partnership interests. It specified that limited partners could build ranch homes on select five-acre sites (the "homesite parcels") and reserved the rest of the land for conservation, recreational, and agricultural use. Each purchaser of a limited partnership interest was required to execute a subscription agreement and make a capital contribution of $350,000 per unit to become a limited partner of BCR I. If BCR I elected to grant a conservation easement on the property, it would "at a later date convey" to each limited partner the fee simple title to one of twenty-four five-acre homesite parcels. BCR I also promised to convey to each limited partner "a membership interest" in the "to be formed Bosque Canyon Ranch Association" ("BCRA"), which would own all of the ranch property other than the homesite parcels.[1] Twenty-four limited partners were admitted to BCR I. In April 2006, one five-acre homesite parcel was deeded to each of them.

Subsequently, BCR II offered partnership interests on substantially the same terms for capital contributions ranging from $367,500 to $550,000. Twenty-three limited partners were admitted to BCR II. Between October 2007 and January 2008, five-acre homesite parcels were deeded to the limited partners of BCR II.

B.    Procedural Background

BCR I filed its federal partnership tax return for tax year 2005, claiming a charitable deduction of $8,400,000 for the value of the conservation easement that it had donated to NALT. BCR II filed its return for tax year 2007, claiming

---

[1] On October 10, 2007, BCRA was formed.

4

No. 16-60068
Cons. w/ 16-60069

a deduction of $7,500,000 for the value of the conservation easement that it had donated to NALT. Each return listed the limited partners' capital contributions and their shares of the charitable deduction.

The Commissioner disallowed the charitable deductions and asserted that the BCR Partnerships were liable for gross valuation misstatement penalties. Each partnership filed a separate petition for readjustment before the Tax Court, which that court consolidated.

Following almost four weeks of trial, the Tax Court issued its Memorandum Findings of Fact and Opinion. It disallowed the charitable deductions, holding that (1) the conservation easements failed to qualify as deductible charitable contributions because they were not given in perpetuity, (2) the sales of the limited partnership interests were actually disguised sales of partnership property, and (3) the gross valuation misstatement penalty was applicable.

The BCR Partnerships timely appealed the Tax Court's ruling. NALT filed a Brief of Amicus Curiae, also urging reversal of the Tax Court's rulings.[2]

II.

STANDARD OF REVIEW

We review the Tax Court's decisions using the same standards that are applicable to district court decisions.[3] We review issues of law de novo and findings of fact for clear error.[4]

---

[2] NALT sets forth many policy reasons for flexibility with respect to conservation easements and maintains that the Tax Court's opinion will chill the interest of landowners in making conservation easement donations.

[3] *Rodriquez v. Comm'r*, 722 F.3d 306, 308 (5th Cir. 2013).

[4] *BMC Software, Inc. v. Comm'r*, 780 F.3d 669, 674 (5th Cir. 2015).

No. 16-60068
Cons. w/ 16-60069

III.

ANALYSIS

A. The Charitable Deductions

1. <u>Applicable Law</u>

A taxpayer has the burden of proving entitlement to a claimed deduction.[5] Congress has provided a tax deduction for the charitable contribution of a conservation easement, which has enjoyed decades of bipartisan support.[6] To be entitled to that deduction under § 170(h) of the Internal Revenue Code ("IRC"), which section governs conservation easements, a taxpayer must contribute a "qualified real property interest" to a "qualified organization . . . exclusively for conservation purposes."[7] Such a taxpayer may deduct the value of a contribution of a partial interest in property if the contribution constitutes a "qualified conservation contribution."[8] A "qualified conservation contribution" is defined as a contribution of "qualified real property interest" to an IRC § 501(c)(3) organization, exclusively for conservation purposes.[9] An easement qualifies under this section of the IRC if it is a "restriction (granted in perpetuity) on the use which may be made of the real property."[10]

2. <u>Analysis</u>

   *a. The Perpetuity Requirement*

---

[5] *See* Tax Court Rule 142(a).

[6] *See* Tax Treatment Extension Act, Pub. L. No 96-541, § 6(b), 94 Stat. 3204, 3206 (1980).

[7] 26 U.S.C. § 170(h)(1)(A)-(C); 26 C.F.R. § 1.170A-14.

[8] 26 U.S.C. § 170(f)(3)(B)(iii).

[9] 26 U.S.C. § 170(h)(1), (3)(B).

[10] 26 U.S.C. § 170(h)(2)(C).

6

No. 16-60068
Cons. w/ 16-60069

As noted, both easements at issue in this case were created, at least in part, to preserve the habitat of the gold-cheeked warbler, an endangered species, as well as the habitats of other birds and animals. The BCR Partnerships "voluntarily, unconditionally and absolutely" granted NALT (a § 501(c)(3) organization), its successors and assigns, "perpetual easement[s] in gross." They subjected the land covered by the easements to a series of covenants and restrictions "in perpetuity" which prohibited residential, commercial, industrial, and agricultural uses over most of the property, including the cutting of trees, dumping, changing of topography, and the introduction of non-native plant or animal species in the conservation areas.

The easements specified a few "reserved rights" that NALT and the BCR Partnerships agreed "could be conducted . . . without having an adverse effect on the protected Conservation Purposes." These reserved rights included constructing staff buildings, barns, recreational or meeting areas, swimming pools, ponds, shelters, pavilions, skeet-shooting stations, facilities for utilities, deer-hunting stands, roads, trails, and driveways.

With NALT's consent, the property covered by the easements could be amended, but *only* to the limited extent needed to modify the boundaries of the five-acre homesite parcels, and even then wholly within the ranch property and without increasing the homesite parcels above five acres. For such a modification to occur, NALT, the BCR Partnerships, and the owner of the homesite parcel in question would have to be in agreement. Modification would be permitted *only* if: (1) "[t]he boundary line modification does not, in [NALT's] reasonable judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes," (2) "[t]he area of each Homestead

7

No. 16-60068
Cons. w/ 16-60069

Parcel [does] not increase," and (3) the modification is properly documented and recorded.

The Tax Court agreed with the Commissioner that the homesite boundary modification provision violated the perpetuity requirement of § 170(h)(2)(C). The court held that because the homesite parcel boundaries could be changed to include property within the original easement, the easement was not granted in perpetuity. It cited *Belk v. Commissioner*[11] for the proposition that an easement is not qualified real property if the boundaries of the property subject to the easement may be modified. We view *Belk* as distinguishable. In that case, the Fourth Circuit affirmed the Tax Court's holding that a provision which allowed the parties to substitute other land for the land that was originally restricted under the easement did not meet the perpetuity requirement of § 170(h).[12]

Here, the Tax Court's reliance on *Belk* is misplaced.[13] The easements at issue in this case differ markedly from the easement in *Belk*. Among other distinctions, the instant easements allow *only* the homesite parcels' boundaries to be changed and then *only* (1) within the tracts that are subject to the easements and (2) without increasing the acreage of the homesite parcel in question. They do not allow any change in the exterior boundaries of the easements or in their acreages. Thus, neither the exterior boundaries nor the total acreage of the instant easements will ever change: Only the lot lines of

---

[11] 140 T.C. 1, 10-11 (2013), aff'd, 774 F.3d 221 (4th Cir. 2014).

[12] 774 F.3d at 226.

[13] The Tax Court cited no other case law to support this holding or the argument that a change to the boundary of an easement disqualifies such easement from becoming a charitable deduction. The Commissioner cites no other cases in support of this holding.

No. 16-60068
Cons. w/ 16-60069

one or more the five-acre homesite parcels are potentially subject to change and then only (1) within the easements and (2) with NALT's consent.

Unlike here, the easement in *Belk* could be moved, lock, stock, and barrel, to a tract or tracts of land entirely different and remote from the property originally covered by that easement.[14] The court in *Belk* reasoned that, because the donor of the easement could develop the same land that it had promised to protect, simply by lifting the easement and moving it elsewhere, it was not granted in perpetuity.[15] The *Belk* court also reasoned that such parcel-swapping could undermine the "qualified appraisal of [the] property."[16]

Those concerns are not present here. Only discrete five-acre residential parcels, entirely within the exterior boundaries of the easement property, could be moved – for example, to account for locations subsequently chosen as nesting sites by the warblers. Even the Commissioner's own expert confirmed that the unencumbered homesite parcels have roughly the same per-acre value as the rest of the ranch which is encumbered by the easements. Thus, changing the boundaries of some of the homesite parcels would not return any value to the easement donors.

The easements in this case more closely resemble the conservation façade easements in *Commissioner v. Simmons*[17] and *Kaufman v. Shulman*[18] than the easement in *Belk*. In those cases, the circuit courts ruled that conservation easements were perpetual even though the trusts could consent

---

[14] 774 F.3d at 225.

[15] *Id.* at 226-27.

[16] *Id.* at 226.

[17] 646 F.3d 6, 9-11 (D.C. Cir. 2011).

[18] 687 F.3d 21, 27-28 (1st Cir. 2012).

9

to the partial lifting of the restrictions to allow repairs and changes to the façades of buildings. Both circuits held that, "clauses permitting consent and abandonment . . . have no discrete effect upon the perpetuity of easements . . . ."[19] Even though those cases addressed the perpetuity requirement in § 170(h)(5(A) rather than the one in § 170(h)(2)(C), the common-sense reasoning that they espoused, i.e., that an easement may be modified to promote the underlying conservation interests, applies equally here. The need for flexibility to address changing or unforeseen conditions on or under property subject to a conservation easement clearly benefits all parties, and ultimately the flora and fauna that are their true beneficiaries.

The benefit to NALT is especially significant in this case in which the perpetuity of the easements is further ensured by NALT's virtually unrestricted discretion to withhold consent to any modifications. The easement grants in this case specify that NALT may withhold consent to adjustments in its "reasonable judgment." Furthermore, neither the BCR Partnerships nor individual limited partners may seek anything beyond declaratory relief to challenge NALT's withheld consent, and even then they must show that NALT acted in an "arbitrary or capricious manner."

One final point: Most IRC provisions that intentionally create narrow "loopholes" to cover narrowly specific situations are deemed to have been adopted in an exercise of legislative grace and thus are subject to strict construction. That does not apply, however, to deductions for conservation easements granted pursuant to IRC §170(h).  It was adopted (1) at the behest of conservation activists, not property-owning, potential-donor taxpayers (2) by

---

[19] *Id.* at 28 (quoting *Simmons*, 646 F.3d at 10).

No. 16-60068
Cons. w/ 16-60069

an overwhelming majority of Congress (3) in the hope of adding untold thousands of acres of primarily rural property for various conservation purposes – acreage that would never become available for conservation if land-owning potential donors were limited to the traditional method of conveyance, i.e., transferring the full fee simple title of such properties.  Therefore, the usual strict construction of intentionally adopted tax loopholes is not applicable to grants of conservation easements made pursuant to §170(h).  Rather, we analyze tax deductions for the grant of conservation easements made pursuant to that article of the IRC under the ordinary standard of statutory construction.  And, when we apply that level of construction here, we are satisfied that our treatment of the issue of perpetuity stands the test.

Mindful of the old proverb, "One picture is worth more than 10,000 words,"[20] we attach to this opinion, as Exhibit 1, a copy of the Conservation Easement Plan of Bosque Canyon Ranch, prepared for NALT and filed as an exhibit in the trial of this case.  It pictures the 3,729.22 acre trapezoid that contains (1) the 2005 Conservation Area of 1,750.1 acres, (2) the 2007 Conservation Area of 1,731.63 acres, and (3) the 47 five-acre homesites totaling 235 acres.  This exhibit makes immediately apparent the facts that (1) the vast majority of the homesites are tightly clustered, largely contiguous, and located in the northernmost tip of the ranch; (2) together, they closely resemble a typical suburban subdivision; (3) almost every homesite shares one or two common side line boundaries with one or more other homesites; and (4) most homesites are located on or in close proximity to the only road inside the easements, which road provides the sole access to the nearest public roads

---

[20] John Bartlett, *Familiar Quotations*, 14th Edition, 1968, p. 149.

11

No. 16-60068
Cons. w/ 16-60069

(Route 22 and County Road 1070). Given this subdivision-like layout and the homesites' contiguity or close proximity to each other and to the only interior road providing ingress and egress to and from the public roads, the Conservation Easement Plan of the ranch visually eschews any realistic likelihood of significant future changes in homesite location – at most, only theoretical or hypothetical changes.  In sum, Exhibit A visually confirms that, realistically and practically, the perpetuity requirement of the Conservation Easement is not invalidated by the provision for homesite parcel adjustment. To conclude otherwise would be to violate the universally recognized maxim, *de minimis non curat lex*.[21]

We are satisfied that any potential future tweaking of the boundaries of one or a few homesite locations cannot conceivably detract from the conservation purposes for which these easements were granted, especially in light of the requirement for NALT's prior approval of any such change. We therefore conclude that the homesite adjustment provision does not prevent the grants of the conservation easements here at issue from satisfying the perpetuity requirement of §170(h)(2)(C) and thus does not prevent the grantors of these easement from taking the applicable charitable deductions.

b. *The "Baseline Documentation" Requirements*

If the donor of a conservation easement retains rights to property subject to the easement "the exercise of which may impair the conservation interests . . . for a deduction to be allowable . . . . the donor must make available to the donee, prior to the time the donation is made, documentation sufficient to

---

[21] "The law does not concern itself with trifles." *De minimis non curat lex*, BLACK'S LAW DICTIONARY (10th ed. 2014).

12

No. 16-60068
Cons. w/ 16-60069

establish the condition of the property at the time of the gift."[22] The purpose of this requirement, which is referred to as "baseline documentation," is to "protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved right."[23]

The regulation governing "baseline documents," states that they *may* include: (1) survey maps showing the property line and other protected areas, (2) a map of the area showing man-made improvements, vegetation, flora and fauna (including rare species locations), (3) land use history, and distinct natural features, (4) an aerial photograph of the property taken as close as possible to the date of the donation, and (5) on-site photographs taken at appropriate locations on the property.[24] By using the words "*may* include" rather than "shall include," the regulation makes clear that the list is flexible and illustrative rather than rigid.

The Tax Court held that appellants failed to make documentation available to NALT that satisfied § 1.170A-14(g)(5)(i). The court labeled the documentation that they did furnish "unreliable, incomplete, and insufficient to establish the condition of the relevant property on the date the respective easements were granted." The Tax court determined that (1) the documentation was untimely, (2) some of the documents were created too early, (3) some of the documents were created too late, and (4) some of the documents were inaccurate. The court focused on the fact that documentation for the December 2005 easement included a report that was completed in March 2007,

---

[22] 26 C.F.R. § 1.170A-14(g)(5)(i).
[23] *Id.*
[24] 26 C.F.R. § 1.170A-14(g)(5)(i)(D).

13

No. 16-60068
Cons. w/ 16-60069

15 months after the date of transfer. The Tax Court also highlighted that the description of the ranch was from April 2004, but the deed was executed in December 2005, and the description of the property was no longer the same because of construction and development during the interim.

But, inexplicably to us, in reaching this determination the Tax Court failed to consider significant information contained in the record, including: (1) aerial photographs and detailed maps, (2) photographs of the ranch taken by a NALT biologist on April 1, 2004, (3) the "Habitat Assessment" report prepared by IES, based on site surveys in April 2004 and December 2005, (4) photographs of the ranch taken by NALT's president in August 2003, (5) the NALT biologist's April 12, 2004 report on the presence and approximate habitat of the gold-cheeked warblers, and (6) a site plan BCR I sent to NALT in September 2005 depicting the location of homesite parcels in relation to the habitat areas that IES identified. Together with the documents that the Tax Court did acknowledge in its opinion, these documents are more than sufficient to establish the condition of the property prior to the donation.

As for timing, the statute relevant to prescribed aerial photographs requires that they be "taken as close as possible to the date the donation is made."[25] The rest of the documentation must be "ma[d]e available to the donee, prior to the time the donation is made."[26] The six items listed above show a great deal of collaboration between the donee and donor prior to the donation, making sure that the donee had documentation sufficient to convey the condition of the property at the time of the gift.[27] The "Site Survey Report"

[25] 26 C.F.R. § 1.170A-14(g)(5)(i)(C).
[26] 26 C.F.R. § 1.170A-14(g)(5)(i).
[27] *Id.*

14

No. 16-60068
Cons. w/ 16-60069

which the Tax Court found to be "too late" because it bore the date of March 2007, was actually a compilation of notes of Christopher Wilson, a NALT biologist, from an April 2004 visit to the ranch, prior to the donation. Neither was the "Site Survey Report" "too early" because, as reflected by the record, the property did not change, other than "common ranch improvements," during the time between Wilson's visit and the 2007 easement grant.

Appellants claim that the Tax Court in this case is the first ever to disallow a deduction for the contribution of a conservation easement based on the inadequacy of the "baseline documentation," and the Commissioner cites no authority to the contrary.[28] Such a holding contradicts the very language of the provision which states that the baseline documentation *may* include these on the list of potential documents, indicating that a flexible approach on documentation is appropriate.[29] The Tax Court's hyper-technical requirements for baseline documentation, if allowed to stand, would create uncertainty by imposing ambiguous and subjective standards for such documentation and are contrary to the very purpose of the statute. If left in place, that holding would undoubtedly discourage and hinder future conservation easements. NALT had documentation before it that was more than sufficient to establish the

---

[28] Appellants also assert that all § 1.170A-14(g)(5)(i) requires is "substantial compliance." They cite an analogous provision, § 1.170A-13(c)(3) in which the tax court has found that a similar requirement "is directory, requiring substantial compliance, rather than mandatory, requiring strict compliance." *Zarlengo v. Comm'r*, T.C. Mem. 2014-161, at *13 (2014). It is true that "the doctrine of substantial compliance has been applied most often in cases involving procedural regulatory requirements." *Averty v. Comm'r*, T.C. Mem. 2012-198, at *4 n.5 (2012). However, the court need not decide if "substantial compliance" is the appropriate standard in this case to find that appellants complied with what was required for "baseline documentation."

[29] *See* 26 C.F.R. § 1.170A-14(g)(5)(i)(D).

No. 16-60068
Cons. w/ 16-60069

condition of the property prior to the donation of the conservation easement. The Tax Court clearly erred in finding to the contrary.

### 3. Conclusion

We vacate the Tax Court's holding regarding the perpetuity of the easements and the baseline documentation, and we remand this case to that court to consider the other grounds[30] asserted by the Commissioner to support the disqualification of the easements as charitable deductions but not addressed by the Tax Court.[31]

## B. Disguised Sales[32]

### 1. Applicable Law

When a partner makes a capital contribution to a partnership in exchange for an interest in the partnership, the transaction is tax-free to both the partner and partnership.[33] If "(i) The transfer of money or other consideration would not have been made but for the transfer of the property; and (ii) In cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations," such a contribution is considered a disguised sale and treated as income.[34]

---

[30] The Commissioner advanced other contentions in support of the disallowance of the conservation easement charitable deduction, including, that the easements were not exclusively for conservations purposes, that the BCR Partnerships lacked charitable intent, and that, even if the easements were deductible, they were overvalued. Red.

[31] Appellants also request that this court clarify the Tax Court's ruling regarding whether the charitable deductions may be allocated to the limited partners. This question is more appropriately addressed at the first instance at the Tax Court level.

[32] The question of disguised sales was not raised in the Commissioner's notice of final partnership administrative adjustment to appellants and was a new matter before the Tax Court. That court held that the Commissioner met the burden on this point.

[33] *See* 26 U.S.C. § 721.

[34] Treas. Reg. § 1.707-3(b)(1)(i), (ii).

2. <u>Analysis</u>

The Tax Court held that the following facts and circumstances established that the property transfers from the BCR Partnerships to the limited partners were disguised sales: (1) "the timing and amount of the distributions to the limited partners were determinable with reasonable certainty at the time the partnerships accepted the limited partners' payments"; (2) "the limited partners had legally enforceable rights, pursuant to LP agreements, to receive their Homesite parcels and appurtenant rights"; (3) "the transactions effectuated exchanges of the benefits and burdens of ownership relating to the Homesite parcels"; (4) "the distributions to the partners were disproportionately large in relation to the limited partners' interest in the partnership profits"; and (5) "the limited partners received their Homesite parcels in fee simple without an obligation to return them to the partnerships." The Tax Court concluded that the BCR Partnerships' receipt of the limited partners' entire contributions, ranging from $350,000 to $550,000, were receipts from disguised sales.

Appellants do not contest the determination that the homesite parcels were the objects of disguised sales; rather they contest the Tax Court's holding that the limited partners' entire contributions were receipts from disguised sales. The Commissioner's expert valued the homesite parcels at $16,500. The local tax assessor valued the homesite parcels at $28,000. Appellants contend that, even attributing the "appurtenant rights" to the homesite parcels, the fair market value of the parcels and such rights are nowhere near the entire

No. 16-60068
Cons. w/ 16-60069

amount that the limited partners contributed, which ranged from $350,000 to $550,000.[35]

The Commissioner counters that the unencumbered area of the ranch and the amount that the limited partners believed would be a pass-through tax deduction for the conservation easement should be included in the amount that is attributable to the disguised sale. The Commissioner's expert valued the unencumbered area of the ranch at $10,338,814.[36] The Commissioner claims that $100,000 of the amount paid by each limited partners is attributable to the attempt to purchase a tax deduction. Combining these values with the value of the homesite parcels, the Commissioner concludes that the value of each disguised sale was approximately $336,500 per limited partner.[37]

### a. The Appurtenant Rights

It appears that the term "appurtenant rights" refers to the limited partners' rights in the common areas of the ranch. We cannot imagine how the fair market value of such rights could equal the entire amount of limited partner contributions.

There is no *ownership* interest in the common areas: The limited partners' rights in those areas are only limited rights of *use*. The Commissioner claims the Appellants stipulated that, under each subscription agreement, the limited partner is entitled to "ownership (via such limited partner's interest in BCR I [or BCR II – whichever is appropriate]) in the assets of BCR I [or BCR

---

[35] It is not clear what the Tax Court includes as the limited partners' "appurtenant rights."

[36] The Commissioner contends that dividing this value by the 47 limited partners, each limited partners' interest would be approximately $220,000.

[37] The Commissioner asserts that this is close to the value paid by those limited partners paid $350,000 and that the limited partners who paid $550,000 obtained homesite parcels with the best view equating to the greater value of disguised sale.

18

II], which included the portion of Bosque Canyon Ranch owned by BCR I [or BCR II]." To the contrary the limited partnership agreements are unambiguously clear that each limited partner receives only (1) one five-acre homesite parcel, (2) a future membership interest in the yet-to-be-formed BCRA, and (3) an ownership interest in one of the partnerships – not in the partnership's underlying property. The evidence in this case confirms beyond cavil that the BCR Partnerships retain ownership of, viz., title to, the common areas, as well as the right to sell significant portions of the common areas. There is no evidence that the BCR Partnerships are holding the property for the "benefit of the limited partners."[38]

Neither is there any record evidence of the value of the limited partners' right to *use* the common areas. Without evidence of the value of such right, there is nothing to support the inclusion of any specific dollar amount for a disguised sale attributable to the "appurtenant rights."

*b. The Pass-Through Tax Deduction*

The Commissioner also contends that $100,000 of the amount paid by each limited partner is attributable to the attempt to purchase a charitable tax deduction for the conservation easement and should be included in the value of the disguised sale.[39] Nothing in the Tax Court's opinion suggests that it

---

[38] It is true that the limited partners agreements provided that the BCR Partnerships would eventually contribute the ranch common areas to BCRA; however, that would not be a transfer of the common areas to the limited partners themselves. They merely received a membership interest in BCRA. Furthermore, as a Texas non-profit corporation, BCRA is prohibited from distributing property to its members. *See Blocker v. State*, 718 S.W.2d 409, 415 (Tex App. – Houston [1st Dist.] 1986, writ. ref'd n.r.e.).

[39] The Commissioner alleges that limited partners were encouraged to think they would get a $100,000 tax deduction. However, there is also evidence that the BCR Partnerships cautioned the limited partners that the IRS might disallow the charitable deduction.

No. 16-60068
Cons. w/ 16-60069

included such value in determining that the entirety of the limited partners' contributions should be included as disguised sales. In addition, we cannot comprehend how such an inclusion would be consistent with the Tax Court's determination that appellants were not entitled to such a deduction.

### 3. Conclusion

We vacate the Tax Court's determination that the entirety of the limited partners' contributions were disguised sales, and we remand[40] for that court to determine the correct amount of any taxable income that results from the disguised sales.

## C. Gross Valuation Misstatement Penalty

### 1. Applicable Law

IRC § 6662(h) provides that a taxpayer is liable for a 40% penalty on the portion of an underpayment of tax liability that is attributable to a gross valuation misstatement.[41] BCR I's and BCR II's statements are governed by different standards. Under IRC § 6662(h) (2005), which applies to BCR I's return, a 40 percent gross valuation misstatement penalty may be assessed if any tax underpayment "is attributable" to a "gross valuation misstatement," which occurs when "the value of any property (or the adjusted basis of any property) claimed on any return . . . is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis."[42] By contrast, IRC § 6662(h) (2006), which applies to BCR II's return, specifies that the gross valuation misstatement need only be by 200 percent.[43] When the

---

[40] Because we are remanding, we need not consider the potential circularity of the argument that the tax benefit itself of a charitable deduction is taxable value.

[41] 26 U.S.C. § 6662(e), (h).

[42] 26 U.S.C. § 6662(e), (h) (2005).

[43] 26 U.S.C. § 6662(e), (h) (2006).

20

No. 16-60068
Cons. w/ 16-60069

actual value of the property is zero and the value claimed is any amount greater than zero, the gross valuation misstatement penalty applies.[44]

2. Analysis

Appellants argue that because the denial of the charitable deductions was based on technical grounds only, any underpayment was not attributable to a misstatement about the value of any property. The Tax Court held that there is no distinction between legal and factual misstatements and that, because the BCR Partnerships conservation easements were not deductible, the limited partners should be assessed the gross valuation misstatement penalty. The court cited one case to support its gross valuation misstatement penalty, *United States v. Woods*. In that case, the IRS imposed a gross valuation misstatement penalty based on underpayments "resulting from a basis-inflating transaction subsequently disregarded for lack of economic substance."[45]

On appeal, Appellants and the Commissioner agree that the holding and reasoning in *Woods* is not applicable to this case.[46] In addition, as we concluded above, the easements are not disallowable as charitable deductions based on the grounds relied on by the tax court.

The Commissioner nevertheless maintains that, regardless of the Tax Court's misplaced reliance on *Woods*, the penalty remains applicable because the easements themselves were grossly overvalued. The Commissioner argues

---

[44] *See* Treas. Reg. § 1.6662-5(g).

[45] 134 S. Ct. 557, 560 (2013).

[46] In a motion for leave to file a motion to reconsider, the Commissioner explained that *Woods* did not hold that "whenever a claimed deduction is disallowed the value or adjusted basis of the item deducted is zero." The Tax Court denied leave to file the motion because it filed after the 30-day deadline.

No. 16-60068
Cons. w/ 16-60069

that because Congress has made it more burdensome for taxpayers who overvalue charitable deduction property to rely on the "reasonable-cause" exception to which most tax penalties are subject, the policy behind the statute supports the conclusion that the gross valuation misstatement penalty is appropriate here, even if the misstatement was not explicitly based on value.[47] But, the values of the easements themselves present a question that is entirely different from the partnerships' entitlement to a charitable deduction for the easements. Both parties acknowledge that the Tax Court did not make a finding of the values of the easements and that there is a difference between the values advanced by the Appellants' appraiser and by the Commissioner's appraiser.[48]

### 3. Conclusion

We vacate and remand to the Tax Court for it to determine whether the gross valuation misstatement penalty is applicable and if so, the proper amount of any penalty.

---

[47] For BCR I's tax year, each taxpayer was allowed to rely on the "reasonable-cause" exception only if it had obtained a "qualified appraisal" from a "qualified appraiser" and "made a good faith investigation of the value of the contributed property." 26 U.S.C. § 6664(c)(2) (2005). In 2006, Congress eliminated the "reasonable-cause" exception altogether for gross valuation misstatement of charitable deduction property. *See* 26 U.S.C. § 6664(c)(3). The Tax Court opined that BCR I might be entitled to a "reasonable cause" defense for the 2005 easement because it had obtained the report of a "qualified appraiser" and had conducted a good faith investigation of the 2005 easements' value. However, the Tax Court went on to discuss the problems with the "baseline documents," then determined that BCR I had failed to make any plausible contentions sufficient to establish "reasonable cause." Should the Tax Court conclude that the 2005 easement was grossly overvalued, BCR I might have a valid argument for "reasonable cause."

[48] In addition, appellants agree that the "issue [of the gross valuation misstatement penalty] should be remanded to the tax court . . . if this Court reverses the tax court's disallowance of deductions based on the perpetuity and baseline documentation requirements."

No. 16-60068
Cons. w/ 16-60069

## IV.

### CONCLUSION

We VACATE the Tax Court's judgment and REMAND for it to rule anew according to the foregoing opinion.

No. 16-60068
Cons. w/ 16-60069

JAMES L. DENNIS, Circuit Judge, dissenting in part and concurring in part:

In my view, Part III.A.2.a of the majority opinion erroneously reverses the Tax Court's holding that the conservation easements granted by the BCR Partnerships were not granted in perpetuity, as required by IRC § 170(h)(2)(c), and thus did not constitute qualified real property interests for which the Partners develop land that was initially protected by the easements simply by hips could claim $15.9 million in charitable contribution income tax deductions.[1] The majority opinion also applies an impermissibly lax standard when reviewing the claimed deduction, contrary to the Supreme Court's instructions in *INDOPCO, Inc. v. C.I.R.*, 503 U.S. 79, 84 (1992), that tax deductions be "strictly construed" and that "the burden of clearly showing the right to the claimed deduction is on the taxpayer," and creates a split with the Fourth Circuit by refusing the apply the rule established in *Belk v. Commissioner*, 774 F.3d 221 (4th Cir. 2014).

As an initial matter, we must be mindful of the well-established rule that tax deductions are a matter of legislative grace, and that they are therefore "strictly construed and allowed only as there is a clear provision therefor." *INDOPCO*, 503 U.S. at 84 (internal quotations and citations removed). Contrary to the majority opinion's assertion,[2] this rule applies with equal force

---

[1] Because I conclude that the easements failed to meet the perpetuity requirement, I need not discuss the Tax Court's alternative conclusions with respect to baseline documentation.

[2] In support of its assertion that "the usual strict construction of intentionally adopted tax loopholes is not applicable to grants of conservation easements made pursuant to §170(h)," the majority opinion notes that the provision was adopted "by an overwhelming majority of Congress." Op. at 11. Never before has this court relied on the size or nature of the majority by which a statutory provision was passed in order to determine its scope.

No. 16-60068
Cons. w/ 16-60069

to a deduction for the donation of a conservation easement.[3] *Belk*, 774 F.3d at 225 (applying *INDOPCO* to the conservation easement deduction provision); *see also Minnick v. C.I.R.*, 796 F.3d 1156, 1159 (9th Cir. 2015) (same); *Scheidelman v. C.I.R.*, 755 F.3d 148, 154 (2d Cir. 2014) (same); *Esgar Corp. v. C.I.R.*, 744 F.3d 648, 653 (10th Cir. 2014) (same).

The value of any qualified charitable contribution made during the taxable year is allowed as a deduction. § 170(a)(1). If the charitable contribution is of a partial interest in property—"an interest in property which consists of less than the taxpayer's entire interest in such property"—the Code allows a deduction only in limited circumstances. § 170(f)(3)(A). One such circumstance exists if the donation qualifies as a "qualified conservation contribution." § 170(f)(3)(B)(iii). The Code defines a "qualified conservation contribution" as "a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." § 170(h)(1). The Code further provides that a "qualified property interest" includes "a restriction (granted in perpetuity) on the use which may be made

---

[3] I am sensitive to the majority opinion's implication that a broader interpretation of § 170(h) would assist conservation efforts by encouraging the donation of conservation easements. However, all tax deductions are designed to serve some public good and yet are narrowly and strictly construed. It is not our domain to decide that the goal served by this deduction is more important than that served by any other. *See Battelstein v. Internal Revenue Serv.*, 631 F.2d 1182, 1185 (5th Cir. 1980) ("We note further that even were this Court of the opinion that there are . . . equitable considerations in this case favoring the [taxpayers], it has long been established that we may not allow such considerations to play a part in our decision. As panels of this Court have recently had occasion to reiterate, citing recent and established Supreme Court precedent, tax deductions are matters of legislative grace and must be narrowly construed."); *Dosher v. United States*, 730 F.2d 375, 376 (5th Cir. 1984) ("[Tax deductions] are exclusively items of legislative grace. Deductions in the code are not found by weighing or balancing equities; they are discovered by a parsing of the legislative language, and, in the case of an ambiguity, a review of the legislative history. Deductions are narrowly construed and the taxpayer bears the burden of proving entitlement.").

of the real property." § 170(h)(2)(C).  As the *Belk* court convincingly reasoned, "[t]he placement of the article 'the' before 'real property' makes clear that a perpetual use restriction must attach to a defined parcel of real property rather than simply some or any (or interchangeable parcels of) real property."  774 F.3d at 225 (citing *American Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000)).    Furthermore,  the  statutory  requirement  that  "[i]n  the  case  of contributions  of  property  for  which  a  deduction  of  more  than  $500,000  is claimed . . . a qualified appraisal of such property" must accompany the tax return, 26 U.S.C. § 170(f)(11)(D), and the regulatory requirement that a donor of  a  conservation  easement  make  available  to  the  donee  "documentation sufficient to establish the condition of the property," Treas. Reg. § 1.170A–14(g)(5)(i), would be rendered meaningless if a donor were permitted to change the boundaries of the conservation easement after the donation was made and the deduction was claimed, *see Belk*, 774 F.3d at 226–27.  Thus, "a conservation easement must govern a defined and static parcel."  *Id.* at 227.  "[T]he Code requires a donor to grant an easement to a single, immutable parcel at the outset  to  qualify  for  a  charitable  deduction."  *Id.*  (footnote  and  emphasis omitted).

The easement at issue in the present case fails because the real property contributed to NALT is not subject to a use restriction in perpetuity.  As in *Belk*, "[t]he [e]asement purports to restrict development rights in perpetuity for  a  defined  parcel  of  land,  but  upon  satisfying  the  conditions  in  the [modification] provision, the taxpayers may remove land from that defined parcel and substitute other land."  774 F.3d at 226.  And contrary to the majority opinion's assertion, this effect is more than merely *de minimis*.  There is no time limit within which the homesite modifications must occur.  There is

No. 16-60068
Cons. w/ 16-60069

no limit upon the distance or the number of times a homesite can be relocated within the outer boundaries of the tract. The forty-seven five-acre homesites that may be substituted with initially-protected land represent 6.69 percent of the 3,509-acre easement tract—a significant portion of the total. *See Balsam Mountain Investments, LLC v. C.I.R.*, 109 T.C.M. (CCH) 1214, at *3 (T.C. 2015) (an easement is not a "qualified real property interest" of the type described in § 170(h)(2)(C) even where a modification provision allowed substitution for "only 5%" of the land initially subject to the easement). Because the easement does not govern a "defined and static" parcel of land, it does not constitute a "qualified conservation contribution" under § 170(h), and the Tax Court was correct in holding that the BCR Partnerships were not entitled to claim a deduction for the contribution. *Belk*, 774 F.3d at 226–27.

The majority opinion attempts to distinguish *Belk*. Respectfully, I find the attempted distinction unpersuasive. As the majority opinion correctly notes, "[t]he court in *Belk* reasoned that, because the donor of the easement could develop the same land that it had promised to protect, simply by lifting the easement and moving it elsewhere, it was not granted in perpetuity." Op. at 9–10. The majority opinion states that the same concern is not implicated in the present case because "[o]nly discrete five-acre residential parcels, entirely within the exterior boundaries of the easement property, could be moved." *Id.* at 9–10. I do not see how this distinction obviates the concern expressed by the *Belk* court: using the modification provision, the BCR Partnerships can lift the easement and swap the previously unprotected five-acre homesites for initially protected land, thereby converting conservation habitat into residential development.

28

No. 16-60068
Cons. w/ 16-60069

In their opening brief, the BCR Partnerships likened the easements to "a slice of Swiss cheese," with forty-seven five-acre homesites representing the holes.  The "defined parcel of real property," *Belk*, 774 F.3d at 225, to which the conservation easement initially attached is one particular slice of cheese, with holes in specific locations.  And just like the holes in a slice of cheese are not themselves cheese, the forty-seven homesites are not a part of the land protected by the conservation easement.  By permitting the BCR Partnerships to change the placement of the homesite parcels, the modification provision expressly permits the substitution of nonprotected land—land within the holes—for land that was originally protected by the easement.  Such substitution changes what real property is subject to the easement.  In other words, any modification produces a different slice of cheese with a different pattern of holes.  This is precisely what the Fourth Circuit disallowed in *Belk*. *See id.* at 226 ("The Easement purports to restrict development rights in perpetuity for a defined parcel of land, but upon satisfying the conditions in the substitution provision, the taxpayers may remove land from that defined parcel and substitute other land.").  That the substitution occurs within the outer boundaries of the total 3,744-acre ranch tract makes no meaningful difference.    Even if most of the initially-protected land will remain undeveloped, the easements do not attach to in perpetuity to the initially defined parcel of real property.  *See id.* at 225; *see also Balsam Mountain Investments, LLC*, 109 T.C.M. (CCH) 1214, at *3.

Similarly, the majority opinion's reliance on the Conservation Easement Plan of Bosque Canyon Ranch is misplaced.  We are bound to look at what the easement allows the parties to do, not what the parties actually plan on doing. *See* § 170(h)(2)(C) (a "qualified property interest" includes "a restriction

29

(granted in perpetuity) on the use whic *may* be made of the real property"
emphasis added)); *see also Belk*, 774 F.3d at 226 ("The [e]asement purports to
restrict development rights in perpetuity for a defined parcel of land, but upon
satisfying the conditions in the [modification] provision, the taxpayers *may*
remove land from that defined parcel and substitute other land." (emphasis
added)).  A picture may be worth 10,000 words, but it cannot replace the plain
language of the easements or the governing statutory and regulatory
provisions.  The terms of the easements would allow the limited partners to
move the homesites anywhere within the outer boundaries of the ranch tract,
subject to the NALT's "reasonable judgment"; there is nothing in the
modification provision that would stop the limited partners from later deciding
that they would rather not be organized as a stereotypical subdivision and
spread the sites across the tract or from deciding that they would prefer that
the homesites be grouped in the northwest corner of the easement rather than
the northeast.  Furthermore, as I read section 3.21 of the easements, there is
nothing to prevent a limited partner from seeking modification of his or her
homesite even after a ranch home has been constructed.  While the NALT could
have grounds for declining to approve such a modification, it could also have
reasons for not doing so.  What is important is that the modification provision
would allow such a change.  Congress did not intend for possibly enormous tax
deductions to be based on the likelihood of continued agreement between the
donor-taxpayer and the non-profit donee as to the land designated as subject
to the conservation easement; rather, it specifically and unequivocally required
that a qualified conservation easement be perpetual.  § 170(h).

Furthermore, I do not think that *Commissioner v. Simmons*, 646 F.3d 6,
9–11 (D.C. Cir. 2011), and *Kaufman v. Shulman*, 687 F.3d 21, 27–28 (1st Cir.

No. 16-60068
Cons. w/ 16-60069

2012), which the majority opinion cites, are relevant to the case at hand. The modification provisions in *Simmons* and *Kaufman* allowed the donee trusts to consent only to physical modifications of the historic buildings' facades. They did not permit modifications of the easements themselves, that is, changes to what property was protected. Unlike in *Belk* and in this case, the same real property in those cases remained protected in perpetuity. The majority opinion asserts that "the common-sense reasoning that [*Simmons* and *Kaufman*] espoused, i.e., that an easement may be changed to promote the underlying conservation interests, applies equally here." Op. 10. But there is nothing in the record to suggest that the modification provisions in this case were designed to promote the underlying conservation interests. While the BCR Partnerships asserted at oral argument that the modification provisions *could* be used to move a homesite if the site's original location was discovered to be the nesting grounds for an endangered bird, contrary to the majority opinion's suggestion, the terms of the easement do not include any requirement that the modification serve conservation purposes. Instead, the provision merely requires that any modification "does not, in [the NALT's] reasonable judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes." This subprovision suggests that any modifications will more likely be made by, and for the benefit of, the BCR Partnerships and the homeowners rather than by the NALT or for the benefit of conservation goals.[4]

---

[4] It appears to me that a swap of a homesite for a five-acre tract of initially-protected land would in most instances be detrimental to the purposes of the conservation easement. Because most of the homesites are grouped together as a typical residential subdivision, they are not as valuable for wildlife conservation purposes as land within the heart of the 3,744-acre tract.

No. 16-60068
Cons. w/ 16-60069

Following *Belk*'s persuasive reasoning, and mindful of the Supreme Court's direction that deductions be strictly construed, *see INDOPCO*, 503 U.S. at 84, I must conclude that the easements at issue in this case did not comply with the requirement in § 170(h)(2)(C) that a defined parcel of real property be protected in perpetuity.  Because Part III.A.2.a of the majority opinion directly and inexplicably conflicts with these principles, I respectfully dissent from that part.

\*

Except as noted in the foregoing dissent and footnote 1, I concur in vacating the Tax Court's judgment and in remanding for the purposes stated by the majority opinion.