**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-2161**
_____

B. V. BELK, JR.; HARRIET C. BELK,

    Petitioners - Appellants,

  v.

COMMISSIONER OF INTERNAL REVENUE,

    Respondent - Appellee.

--------------------------------------

THE LAND TRUST OF NAPA COUNTY; ANN TAYLOR SCHWING; ROGER COLINVAUX; JOHN ECHEVERRIA; JOHN LESHY; NANCY MCLAUGHLIN; JANET MILNE,

    Amici Supporting Respondent.

_____

Appeal from the United States Tax Court.
(Tax Ct. No. 005437-10)

_____

Argued: October 29, 2014    Decided: December 16, 2014

_____

Before MOTZ, KING, and KEENAN, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Keenan joined.

_____

**ARGUED:** David Mace Wooldridge, SIROTE & PERMUTT, P.C., Birmingham, Alabama, for Appellants. Patrick J. Urda, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Ronald A. Levitt, Gregory P. Rhodes, Michelle A.

Levin, SIROTE & PERMUTT, P.C., Birmingham, Alabama, for Appellants. Tamara W. Ashford, Acting Assistant Attorney General, Gilbert S. Rothenberg, Jonathan S. Cohen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Ann Taylor Schwing, BEST BEST & KRIEGER, L.L.P., Sacramento, California, for Amici Land Trust of Napa County and Ann Taylor Schwing. Douglas A. Ruley, Environmental and Natural Resources Law Clinic, VERMONT LAW SCHOOL, South Royalton, Vermont, for Amici Roger Colinvaux, John Echeverria, John Leshy, Nancy McLaughlin, and Janet Milne.

---

DIANA GRIBBON MOTZ, Circuit Judge:

After taxpayers donated a conservation easement to a land trust, they claimed a $10,524,000 charitable deduction for the asserted value of the easement. The Tax Court held that the easement did not qualify as a charitable contribution and so the taxpayers were not entitled to the deduction. For the reasons that follow, we affirm.

I.

The parties stipulated to the following facts before the Tax Court.

Between 1994 and 1996, B.V. and Harriet Belk accumulated roughly 410 acres of land straddling Union and Mecklenburg Counties outside of Charlotte, North Carolina. In February 1996, the Belks formed a limited liability company, Olde Sycamore, LLC, and transferred to it their newly acquired parcel of land. Olde Sycamore developed the land, building a golf course and surrounding it with 402 residential lots, which were later sold to builders. Single-family homes now occupy those lots, and Olde Sycamore continues to own the golf course. Old Sycamore remains wholly owned by the Belks -- ninety-nine percent by B.V., and one percent by his wife, Harriet.

In 2004, Olde Sycamore executed a conservation easement ("the Easement") covering roughly 184 acres of the land on which

3

the golf course now sits. The Easement was then transferred to Smoky Mountain National Land Trust, Inc. ("the Trust") and recorded in both Union and Mecklenburg Counties. The Easement imposes on the 184-acre parcel a number of enforceable use restrictions, including a prohibition on further development and a requirement that the parcel be used "for outdoor recreation." Olde Sycamore granted the Easement in perpetuity, subject to certain "Reserved Rights."

One such reserved right, central to this appeal, permits Olde Sycamore to "substitute an area of land owned by [it] which is contiguous to the Conservation Area for an equal or lesser area of land comprising a portion of the Conservation Area." Olde Sycamore's substitution right is conditioned upon the Trust's agreement that "the substitute property is of the same or better ecological stability," that "the substitution shall have no adverse effect on the conservation purposes," and that the fair market value of the substituted property is at least equal to that of the property originally subject to the Easement. The substitution provision thus permits Olde Sycamore, if the Trust agrees (and it cannot unreasonably withhold agreement), to swap land in and out of the Easement. In doing so, Olde Sycamore can shift the use restriction from one parcel to another, provided the Easement continues to cover at least 184 acres and to advance its stated conservation

4

purpose. Such a substitution becomes final when reflected in a formal amendment to the Easement recorded in the relevant county or counties.

The Easement contains a savings clause, also of relevance here, which circumscribes the Trust's ability to agree to such amendments. This clause provides that the Trust "shall have no right or power to agree to any amendments . . . that would result in this Conservation Easement failing to qualify . . . as a qualified conservation contribution under Section 170(h) of the Internal Revenue Code and applicable regulations." Section 170(h) details the circumstances under which the grant of a conservation easement may be claimed as a charitable contribution deduction. See 26 U.S.C. § 170(h) (2012).

On its 2004 income tax return, Olde Sycamore claimed a deduction of $10,524,000 for the donation of the Easement to the Trust. The deduction passed through to the Belks as the sole owners of Olde Sycamore, see 26 U.S.C. § 702(a)(4), and the Belks claimed the deduction on their 2004, 2005, and 2006 income tax returns.

In 2009, the Commissioner of Internal Revenue sent the Belks a notice of deficiency, informing them that they owed substantial amounts in back taxes for tax years 2004, 2005, and 2006. The Commissioner reasoned that the Belks had not "established that all the requirements of IRC § 170 and the

corresponding Treasury Regulations ha[d] been satisfied to enable [them] to deduct the noncash charitable contribution of a qualified conservation contribution."

The Belks filed a petition for redetermination with the Tax Court. The Tax Court upheld the Commissioner's determination in a published opinion, and upon motion for reconsideration by the Belks, issued a supplementary opinion reaching the same conclusion. The Belks timely appealed to this court, and we have jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

II.

The Internal Revenue Code permits taxpayers to deduct from their taxable income the value of a qualifying charitable contribution. 26 U.S.C. § 170(a)(1). The Code generally restricts a taxpayer's ability to claim a charitable deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property." Id. § 170(f)(3)(A). But it provides an exception to the general rule for "a qualified conservation contribution." Id. § 170(f)(3)(B)(iii).

The Code defines a "qualified conservation contribution" as "a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." Id. § 170(h)(1). It is the first requirement --

6

that the donation be of "a qualified real property interest" --
that the Tax Court concluded the Belks had not satisfied here,
and which is now the focus of this appeal.[1]

A "qualified real property interest" includes "a
restriction (granted in perpetuity) on the use which may be made
of the real property." Id. § 170(h)(2)(C). Because an easement
is, by definition, a "restriction . . . on the use which may be
made of . . . real property," id., the donation of a
conservation easement can properly provide the basis of a
deduction under the Code -- if the restriction is granted in
perpetuity.

The Treasury Regulations offer a single -- and exceedingly
narrow -- exception to the requirement that a conservation
easement impose a perpetual use restriction. The regulations
provide that in the event that a

> subsequent unexpected change in the conditions
> surrounding the property . . . make[s] impossible or
> impractical the continued use of the property for
> conservation purposes, the conservation purpose can
> nonetheless be treated as protected in perpetuity if
> the restrictions are extinguished by judicial
> proceeding and all of the donee's proceeds . . . from
> a subsequent sale or exchange of the property are used

---

[1] The parties agree that the Trust is a "qualified
organization." In addition to the ground relied on by the Tax
Court, the Commissioner also contended that the donation
furthers no valid "conservation purpose," and that, in any
event, its value did not approach the $10,524,000 the Belks
claimed. The Tax Court did not reach these arguments; nor do
we.

> by the donee organization in a manner consistent with the conservation purposes of the original contribution.

Treas. Reg. § 1.170A-14(g)(6)(i) (emphasis added). Thus, absent these "unexpected" and extraordinary circumstances, real property placed under easement must remain there in perpetuity in order for the donor of the easement to claim a charitable deduction.

Where, as here, the parties have proceeded on stipulated facts before the Tax Court, we "review the Tax Court's legal decisions de novo." Pfister v. Commissioner, 359 F.3d 352, 353 (4th Cir. 2004). In doing so, we keep in mind that deductions are a matter of legislative grace and the taxpayers bear the burden of proving their entitlement to a claimed deduction. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

### III.

The Tax Court concluded that the Belks were not entitled to claim a deduction for the donation of the easement because Olde Sycamore had not donated "a qualified real property interest." 26 U.S.C. § 170(h)(1). The Tax Court reasoned that "because the conservation easement agreement permits [the Belks] to change what property is subject to the conservation easement, the use restriction was not granted in perpetuity," as required by

8

§ 170(h)(2)(C). The Belks maintain that the Code requires only a restriction in perpetuity on <u>some</u> real property, rather than <u>the</u> real property governed by the original easement. Appellants' Br. 26. The Easement here satisfies this requirement, they argue, because any property removed from the Easement must be replaced with property of equal value that is then subject to the same use restrictions.

The plain language of the Code belies this contention. For the Code expressly provides that a "qualified property interest" includes "a restriction (granted in perpetuity) on the use which may be made of <u>the real property</u>." 26 U.S.C. § 170(h)(2)(C) (emphasis added). The placement of the article "the" before "real property" makes clear that a perpetual use restriction must attach to a defined parcel of real property rather than simply <u>some</u> or <u>any</u> (or interchangeable parcels of) real property. For "the" is a definite article, which lends to the noun that follows it a specific rather than general identity. See <u>American Bus Ass'n v. Slater</u>, 231 F.3d 1, 4-5 (D.C. Cir. 2000); <u>see also</u> <u>Webster's Third New International Dictionary</u> 2368 (1993) (providing the primary definition of "the" as "a function word [used] to indicate that a following noun . . . refers to someone or something previously mentioned or clearly understood from the context or the situation").

Reading § 170(h)(1) and (2) together further makes clear that the defined parcel of land identified by the phrase "the real property" is the real property to which the donated conservation easement initially attached. These provisions of the Code provide:

> (h) Qualified conservation contribution.
> (1) In general. For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes.
> (2) Qualified real property interest. For purposes of this subsection, the term "qualified real property interest" means any of the following interests in real property: (A) the entire interest of the donor other than a qualified mineral interest, (B) a remainder interest, and (C) a restriction (granted in perpetuity) on the use which may be made of the real property.

26 U.S.C. § 170(h)(1)-(2) (2012). Section 170(h)(2) defines the term "qualified real property interest" as used in § 170(h)(1)(A), providing that "the term qualified real property interest means . . . a restriction (granted in perpetuity) on the use . . . of the real property." Thus, in order to qualify as a qualified conservation contribution, the parcel in which use must be restricted in perpetuity is "the parcel" that must be contributed "to a qualified organization . . . exclusively for conservation purposes."

10

The Easement at issue here fails to meet this requirement because the real property contributed to the Trust is not subject to a use restriction in perpetuity. The Easement purports to restrict development rights in perpetuity for a defined parcel of land, but upon satisfying the conditions in the substitution provision, the taxpayers may remove land from that defined parcel and substitute other land. Thus, while the restriction may be perpetual, the restriction on "the real property" is not. For this reason, the Easement does not constitute a "qualified conservation contribution" under § 170(h) and the Belks were not entitled to claim a deduction for the contribution.

Moreover, permitting the Belks to claim a deduction for the Easement would enable them to bypass several requirements critical to the statutory and regulatory schemes governing deductions for charitable contributions. For instance, 26 U.S.C. § 170(f)(11)(D) requires that "[i]n the case of contributions of property for which a deduction of more than $500,000 is claimed . . . a qualified appraisal of such property" must accompany the tax return. Permitting the Belks to change the boundaries of the Easement renders the appraisal meaningless; it is no longer an accurate reflection of the value of the donation, for parts of the donation may be clawed back. It matters not that the Easement requires that the removed

11

property be replaced with property of "equal or greater value," because the purpose of the appraisal requirement is to enable the Commissioner, <u>not</u> the donee or donor, to verify the value of a donation. The Easement's substitution provision places the Belks beyond the reach of the Commissioner in this regard.

The requirement in the Treasury Regulations that a donor of a conservation easement make available to the donee "documentation sufficient to establish the condition of the property" would also be skirted if the borders of an easement could shift. Treas. Reg. § 1.170A-14(g)(5)(i); <u>see also</u> <u>id.</u> § 1.170A-14(g)(5)(i)(A)-(D) (listing maps and photographs of the property as potential sources of this documentation). Not only does this regulation confirm that a conservation easement must govern a defined and static parcel, it also makes clear that holding otherwise would deprive donees of the ability to ensure protection of conservation interests by, for instance, examination of maps and photographs of "the protected property." <u>Id.</u>

The regulations do provide that the use restrictions on a donated easement can be extinguished without sacrificing the donor's tax benefit in one limited instance. That is, when "a subsequent unexpected change in the conditions surrounding the property that is the subject of a donation . . . make impossible or impractical the continued use of the property for

12

conservation purposes" and "the restrictions are extinguished by judicial proceeding." Id. § 170A-14(g)(6). The Belks maintain that this limited exception to the perpetuity requirement "would be invalid" if the Tax Court's reasoning is upheld. Reply Br. 5. That argument fails. This regulation permits a donor to retain a tax benefit when a conservation easement, though "granted in perpetuity," subsequently cannot further its conservation purpose and is extinguished by court order. The regulation does nothing to undercut the correctness of the Tax Court's holding here that the Code requires a donor to grant an easement to a single, immutable parcel at the outset to qualify for a charitable deduction.[2]

In short, the Code and Treasury Regulations together make clear that § 170(h)(2)(C) means what it says: a charitable deduction may be claimed for the donation of a conservation

---

[2] The Belks raise a similar argument with respect to Treas. Reg. § 1.170A-14(c)(2), which permits a donee to "exchange[]" property subject to a conservation easement in the same limited circumstance, i.e., "[w]hen a later unexpected change . . . makes impossible or impractical the continued use of the property for conservation purposes." This provision is similarly invalid, they argue, if § 170(h)(2)(C) categorically prohibits property from being swapped in and out of a conservation easement. Appellants' Br. 20-21. This argument also fails. That the regulations permit the donee organization to exchange restricted property under conditions both strict and rare fails to undercut the requirement that the donor grant an easement to a single, defined parcel. Indeed, that the regulations narrowly limit the ability of an easement to change after donation counsels against permitting a donor to contract for the right to make such changes in advance of the donation.

13

easement only when that easement restricts the use of the donated property in perpetuity. Because the Easement here fails to meet this requirement, it is ineligible to form the basis for a charitable deduction under § 170(h)(2)(C).

IV.

The Belks offer two reasons why we should reject this straightforward application of statutory text.

First, they maintain that out-of-circuit cases support the notion that § 170(h)(2)(C) does not require that restrictions attach to a single, defined parcel. See Appellants' Br. 21-23 (citing Kaufman v. Shulman, 687 F.3d 21 (1st Cir. 2012); Commissioner v. Simmons, 646 F.3d 6 (D.C. Cir. 2011)). In those cases, the courts found that preservation easements covering the facades of historic buildings, which reserved to the donee the right to abandon the easement, did not violate § 170(h)(5)(A) given the negligible possibility that the donee would actually abandon its rights under the easement.

According to the Belks, Simmons and Kaufman demonstrate that courts have approved deductions for easements that "put the perpetuity of the conservation easement at far greater risk than the clause at issue in this case." Appellants' Br. 23. But this argument misses the critical distinction between those cases and this one. The Simmons and Kaufman courts considered

14

whether the easements before them satisfied the requirement in § 170(h)(5)(A) that the conservation purpose be protected "in perpetuity." See Simmons, 646 F.3d at 9-10; Kaufman, 687 F.3d at 27-28. Here, the question is whether the Easement satisfies the requirement in § 170(h)(2)(C) that the use restrictions on the parcel be granted "in perpetuity." Though both requirements speak in terms of "perpetuity," they are not one and the same. The provision at issue here, § 170(h)(2)(C), governs the grant of the easement itself, while the provision at issue in Simmons and Kaufman, § 170(h)(5)(A), governs its subsequent enforcement. Thus, Simmons and Kaufman plausibly stand only for the proposition that a donation will not be rendered ineligible simply because the donee reserves its right not to enforce the easement. They do not support the Belks' view that the grant of a conservation easement qualifies for a charitable deduction even if the easement may be relocated. Indeed, as we have explained, such a holding would violate the plain meaning of § 170(h)(2)(C).

The second reason the Belks offer for ignoring the clear statutory language of § 170(h)(2)(C) is equally unpersuasive. They contend that because North Carolina law permits parties to amend an easement, the Tax Court's logic would render all conservation easements in North Carolina ineligible under § 170(h). See Appellants' Br. 32-37. But whether state

15

property and contract law permits a substitution in an easement is irrelevant to the question of whether federal tax law permits a charitable deduction for the donation of such an easement. Contrary to the Belks' suggestion, accepting this fact does not require a conclusion that "no conservation easement could qualify for a deduction unless the applicable state law prohibited amendments to make a substitution of property." Id. at 36. Rather, § 170(h)(2)(C) requires that the gift of a conservation easement on a specific parcel of land be granted in perpetuity to qualify for a federal charitable deduction, notwithstanding the fact that state law may permit an easement to govern for some shorter period of time. Thus, an easement that, like the one at hand, grants a restriction for less than a perpetual term, may be a valid conveyance under state law, but is still ineligible for a charitable deduction under federal law.

V.

Finally, the Belks argue that even if we find the substitution provision in the Easement prevents it from satisfying the requirements of § 170(h)(2)(C), the savings clause nonetheless renders the Easement eligible for a deduction. The savings clause provides in pertinent part that the Trust:

16

> shall have no right or power to agree to any amendments . . . that would result in this Conservation Easement failing to qualify . . . as a qualified conservation contribution under Section 170(h) of the Internal Revenue Code and applicable regulations.

The Belks contend that if we should "determine that Section 170(h)(2)(C) precludes substitutions of property," as we have, this savings clause "operates to 'save' [their] deduction by precluding the parties from executing an amendment allowing such a substitution of property." Reply Br. 20. In other words, the Belks argue that the savings clause negates a right clearly articulated in the Easement -- their right to substitute property -- but only if triggered by an adverse determination by this court. We decline to give the savings clause such effect.

The Belks properly acknowledge that "the IRS and the courts have rejected 'condition subsequent' savings clauses, which revoke or alter a gift following an adverse determination by the IRS or a court." Appellants' Br. 39 (citing Commissioner v. Procter, 142 F.2d 824, 827-28 (4th Cir. 1944)). They maintain, however, that the savings clause here is not a "condition subsequent" savings clause, but simply "an interpretive clause meant to insure that [the Trust] makes no amendment to the Conservation Easement . . . that would be inconsistent with the overriding intention of the parties." Id. The Belks are wrong.

17

A condition subsequent rests on a future event, "the occurrence of which terminates or discharges an otherwise absolute contractual duty." 30 Williston on Contracts § 77:5 (4th ed.). When a savings clause provides that a future event alters the tax consequences of a conveyance, the savings clause imposes a condition subsequent and will not be enforced. See Procter, 142 F.2d at 827; Estate of Christiansen v. Commissioner, 130 T.C. 1, 13 (2008), aff'd, 586 F.3d 1061 (8th Cir. 2009). As the IRS has explained, clauses that seek to "recharacterize the nature of the transaction in the event of a future" occurrence "will be disregarded for federal tax purposes." I.R.S. Tech. Adv. Mem. 2002-45-053 (Nov. 8, 2002).

In Procter, which the Belks do not suggest was incorrectly decided, the taxpayer sought to avoid the federal gift tax by including a savings clause within the trust conveying the gift. That clause provided that "[t]he settlor is . . . satisfied that the present transfer is not subject to Federal gift tax," but added that if "a competent federal court of last resort" determined "that any part of the transfer . . . is subject to gift tax," that part "shall automatically be deemed not to be included in the conveyance" and so not subject to gift tax. Procter, 142 F.2d at 827. We rejected the taxpayer's argument out of hand, holding that tax consequences could not "be avoided by any such device as this." Id. We explained that the

18

taxpayer's attempt to avoid tax, by providing the gift "shall be void" as to property later held "subject to the tax," was "clearly a condition subsequent," and involved the "sort of trifling with the judicial process [that] cannot be sustained." Id.

So it is here. The Belks' Easement, by its terms, conveys an interest in real property to the Trust. The savings clause attempts to alter that interest in the future if the Easement should "fail[] to qualify as a . . . qualified conservation contribution under Section 170(h)." In seeking to invoke the savings clause, the Belks, like the taxpayer in Procter, ask us to "void" the offending substitution provision to rescue their tax benefit.

The Belks' attempt to distinguish Procter fails. They find significant the fact that the savings clause there altered the conveyance "following an adverse IRS determination or court judgment," while the savings clause here does not expressly invoke the IRS or a court. Appellants' Br. 39. This is a distinction without a difference. Though not couched in terms of an "adverse determination" by the IRS or a court, the Belks' savings clause operates in precisely the same manner as that in Procter. The Easement plainly permits substitutions unless and until those substitutions "would result" in the Easement's "failing to qualify . . . under Section 170(h) of the Internal

19

Revenue Code," a determination that <u>can only be made</u> by either the IRS or a court. Indeed, relying on <u>Procter</u>, the IRS has found a clause void as a condition subsequent notwithstanding its failure to reference determination by a court. <u>See</u> Rev. Rul. 65-144, 1965-1 C.B. 442, 1965 WL 12880. The Belks do not suggest that the IRS erred in so concluding, nor do they attempt to distinguish that clause from their own.

They do contend, however, that their savings clause is simply "an interpretive clause" meant to ensure the "overriding intention" of the parties that the Easement qualify as a charitable deduction. Appellants' Br. 39. We are not persuaded. When a clause has been recognized as an "interpretive" tool, it is because it simply "help[ed] illustrate the decedent's intent" and was not "dependent for [its] operation upon some subsequent adverse action by the Internal Revenue Service." I.R.S. Tech. Adv. Mem. 79-16-006 (1979) (distinguishing <u>Procter</u>); <u>see also</u> <u>Estate of Cline v. Commissioner</u>, 43 T.C.M. (CCH) 607 (T.C. 1982) (clause valid to interpret "ambiguous . . . language in a poorly drafted . . . agreement," but not to "change the property interests otherwise created"); Rev. Rul. 75-440, 1975-2 C.B. 372, 1975 WL 34994 at *2 (clause "relevant . . . <u>only</u> because it helps indicate the testator's intent not to give . . . a disqualifying power" (emphasis added)).

20

In contrast to those situations, the Belks' intent to retain "a disqualifying power" is clear from the face of the Easement. There is no open interpretive question for the savings clause to "help" clarify. If the Belks' "overriding intent[]" had been, as they suggest, merely for the Easement to qualify for a tax deduction under § 170(h), they would not have included a provision so clearly at odds with the language of § 170(h)(2)(C). In fact, the Easement reflects the Belks' "overriding intent[]" to create an easement that permitted substitution of the parcel -- in violation of § 170(h)(2)(C) -- and to jettison the substitution provision only if it subsequently caused the donation to "fail[] to qualify . . . as a qualified conservation contribution under Section 170(h)." Thus, the Belks ask us to employ their savings clause not to "aid in determining [their] intent," Rev. Rul. 75-440, but to rewrite their Easement in response to our holding. This we will not do.[3]

---

[3] In a last-ditch effort, the Belks further argue that the savings clause is designed "to accommodate evolving . . . interpretation of Section 170(h)" so that the Easement "continue[s] to be consistent" with their intent to comply with that provision. Reply Br. 20. But the statutory language of § 170(h)(2)(C) has not "evolved" since the provision was enacted in 1980. See Pub. L. 96-541, 94 Stat. 3204 (Dec. 17, 1980). The simple truth is this: the Easement was never consistent with § 170(h), a fact that brings with it adverse tax consequences. The Belks cannot now simply reform the Easement because they do not wish to suffer those consequences.

21

Indeed, we note that were we to apply the savings clause as the Belks suggest, we would be providing an opinion sanctioning the very same "trifling with the judicial process" we condemned in Procter.  142 F.2d at 827.  Moreover, providing such an opinion would dramatically hamper the Commissioner's enforcement power.  If every taxpayer could rely on a savings clause to void, after the fact, a disqualifying deduction (or credit), enforcement of the Internal Revenue Code would grind to a halt.

VI.

For the foregoing reasons, the judgment of the Tax Court is

AFFIRMED.