153 T.C. No. 7

UNITED STATES TAX COURT

COAL PROPERTY HOLDINGS, LLC, COAL LAND MANAGER, LLC,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27778-16.                              Filed October 28, 2019.

In 2013 P donated a conservation easement to a qualified organization. The easement deed provided that, if the property were sold following judicial extinguishment of the easement, the donee organization would receive a share of the proceeds, "after the satisfaction of prior claims," determined by a formula. Under the formula, the donee's share was equal to the property's fair market value (FMV) at the time of sale, "minus any increase in value after the date of th[e] grant attributable to improvements," multiplied by a fraction specified in sec. 1.170A-14(g)(6)(ii), Income Tax Regs. Alternatively, if this formula produced a result "different from" that required by the regulation, the deed provided that the donee would receive a share of the proceeds as determined by the regulation.

1. Held: The easement does not satisfy sec. 1.170A-14(g)(6), Income Tax Regs., because the portion of the proceeds to which the donee is entitled is improperly reduced by (a) amounts paid in satisfaction of prior claims against P and (b) amounts inuring to P that are

attributable to (i) appreciation in the value of improvements existing when the easement was granted plus (ii) the FMV of any improvements P subsequently made to the property. PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193 (5th Cir. 2018), followed.

2. Held, further, the alternative calculation of proceeds specified in the deed, which is applicable only if the deed's formula is determined to be "different from" that required by the regulation, constitutes a "condition subsequent" saving clause that will not be judicially enforced. Belk v. Commissioner, 774 F.3d 221, 225 (4th Cir. 2014), aff'g 140 T.C. 1 (2013), followed.

3. Held, further, R properly disallowed in its entirety the charitable contribution deduction claimed by P because the conservation purpose of the easement was not "protected in perpetuity" as required by I.R.C. sec. 170(h)(5)(A).

John P. Barrie, William G. Driggers, and Jerome A. Breed, for petitioner.

Sergio Garcia-Pages, Andrew M. Titkin, Michelle M. Robles, and Timothy A. Sloane, for respondent.

OPINION

LAUBER, Judge: In September 2013 Coal Property Holdings, LLC (Coal Holdings), acquired 3,713 acres of land in Tennessee that had been subject to surface mining during the last century. Three weeks later an entity owned by an investor acquired a 99% interest in Coal Holdings for $32.5 million. Three days

later Coal Holdings donated a conservation easement over the property to a Tennessee land trust. On its Federal income tax return for 2013 Coal Holdings claimed for this donation a charitable contribution deduction of $155.5 million. The Internal Revenue Service (IRS or respondent) issued Coal Holdings' tax matters partner (TMP or petitioner) a notice of final partnership administrative adjustment (FPAA) that disallowed the deduction in full. The TMP timely petitioned this Court for review.

Respondent has filed a motion for partial summary judgment urging three alternative grounds for denying the claimed deduction. At this stage of the case we find it necessary to address only one of these theories, namely, that the easement does not meet the requirements for a charitable contribution deduction because the conservation purpose was not "protected in perpetuity." See sec. 170(h)(5)(A).[1] That is because the charitable grantee was not absolutely entitled to a proportionate share of the proceeds in the event the property was sold following a judicial extinguishment of the easement. See Carroll v. Commissioner, 146

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round most monetary amounts to the nearest dollar.

T.C. 196, 212 (2016); sec. 1.170A-14(g)(6), Income Tax Regs. We will grant respondent's motion for partial summary judgment on this ground.

Background

There is no dispute as to the following facts, which are drawn from the parties' motion papers and the attached declarations and exhibits. Coal Holdings had its principal place of business in Georgia when the petition was filed.

A.     The Property

This case involves a 3,713-acre tract of land in Campbell County, Tennessee (Property). Although not actively mined within the last 25 years, the Property during the previous century had been periodically subject to surface mining for coal. More recently the Property has been partially reclaimed by force of nature.

Lindsay Land, LLC (Lindsay Land), acquired the Property by capital contribution in 1995. In 2001 Lindsay Land executed an oil and gas lease (Lease) with a pair of lessees. The lessees contracted to pay Lindsay Land a one-eighth royalty on oil or gas extracted from the Property, with the Lease to remain in effect so long "as any crudes are produced * * * or operations for drilling are continued." The Lease provided that the lessees' rights would not be affected by Lindsay Land's transfer of its interest in the Property or in the Lease. Twenty natural gas

wells were drilled on the Property pursuant to the Lease, and 14 were still operating when the conservation easement was granted.

In November 2012 Lindsay Land entered into an agreement with Edward Goodman, the owner of an adjacent property (Goodman Property). This agreement was executed to enable Lindsay Land to "enter the Goodman Property for the purpose of (i) extracting coal from the subsurface of the * * * Property using current mineable techniques and facilities that will be located on the Goodman Property, and (ii) transporting such coal across the Goodman Property." In exchange Lindsay Land agreed to pay a "wheelage fee" for the right to transport coal across the Goodman Property and "[a] royalty on any marketable coal extracted by Lindsay" in this manner.

B.    Ownership Change

In September 2012 articles of organization were filed for LCV Fund XII, LLC (LCV Fund XII), a Georgia limited liability company. Paul E. Viera, Jr., an investor, then acquired a 99.99% interest in LCV Fund XII. Through Green Zone Investments, LLC, Viera made a capital contribution of $40,348,500 to LCV Fund XII.

In December 2012 articles of organization were filed for Coal Holdings, which elected to be treated as a partnership for Federal income tax purposes. The

partnership was initially owned 99.99% by Lindsay Land and Lindsay Mining Manager, LLC (Lindsay Manager), of which Lindsay Land was initially the sole member. On September 20, 2013, Lindsay Land executed a quitclaim deed transferring all its interest in the Property to Coal Holdings.

On October 14, 2013, a purchase and sale agreement was executed among Lindsay Land, Lindsay Manager, and LCV Fund XII. When the dust cleared, LCV Fund XII ended up owning a 98.99% interest in the capital and profits of Coal Holdings in exchange for a payment of $32,522,740.[2] Three days later, on October 17, 2013, Coal Holdings conveyed an open space conservation easement over the Property to Foothills Land Conservancy (Conservancy), a tax-exempt organization under section 501(a) and (c)(3) and a "qualified organization" for purposes of section 170(h)(3). The deed was recorded the next day.

C.    The Easement Deed

1.    Mining-Related Provisions

The Conservation Easement and Declaration of Restrictive Covenants (Easement Deed) states that its interpretation is governed by Tennessee law. The 13th "whereas" clause recites that the easement "would prevent any and all surface

---

[2]Respondent represents that he has not verified this payment but assumes for purposes of this motion that it was made.

mining on the Property in perpetuity, thus allowing the land to continue to recover from the mining that took place periodically * * * during the last 100 years." It recites that "Mountaintop Mining-Valley Fill techniques"--a form of surface mining--"are known to be highly destructive to both environment and human health" and that a "conservation easement would ensure that such destructive mining techniques would never occur on the Property."

The 14th "whereas" clause recites that a conservation easement would provide "a glimpse into the long-term effects of surface mining." Section 4.10 reserves to the grantor the right to "allow the Property to be used for scientific research on the natural reclamation of strip mining areas." The Property is described as "a good candidate" for such study "because there cannot be any subsequent surface mining on the Property."

Section 3.3 of the Easement Deed prohibits "[t]he filling, excavating, dredging, surface mining (including mining for coal), drilling, or any removal of * * * minerals * * * from the property." "No surface mining of any kind, particularly any surface mining in violation of * * * section 170(h)(5), shall be permitted." Section 170(h)(5)(B)(i) generally provides that a conservation purpose shall not be treated as protected in perpetuity "if at any time there may be extraction or removal of minerals by any surface mining method."

Section 3.3 of the Easement Deed specifies two exceptions to this general ban on mineral extraction. First, it permits "the maintenance and use of natural gas wells pursuant to the terms of the [L]ease currently in place." Second, "[t]o the extent * * * [Coal Holdings] owns the mineral rights with respect to the Property," it allows the "exploration for, or development and extraction of, minerals * * * by any mining method," unless "in the reasonable discretion of Grantee" such activity "would significantly impair or interfere with * * * the Conservation Purposes of this Easement."

Section 4.11 notes that "[t]here are currently several natural gas wells on the Property as well as two [cell phone] communication towers." It provides that "those uses will continue, subject to the terms and conditions of the documents establishing such uses." Coal Holdings commits to making reasonable efforts to ensure that the lessees conduct their operations "so as to prevent any damage to the timber, forest products, and other [conservation] interests."

2. Judicial Extinguishment Provisions

If circumstances should arise in the future that render the conservation purposes impossible to accomplish, section 9.1 of the Easement Deed states that the easement "can only be terminated or extinguished * * * by judicial proceedings in a court of competent jurisdiction." If the Property is sold following such judicial

action, "[t]he amount of the proceeds to which the Grantee shall be entitled, after the satisfaction of prior claims, * * * shall be the stipulated fair market value of this Easement * * * as determined in accordance with Section 9.2 or * * * [s]ection 1.170A-14, [Income Tax Regs.,] if different from Section 9.2." In the event of a condemnation, the grantee is likewise entitled to receive a share of the proceeds as determined by "the ratio set forth in Section 9.2."

Section 9.2 specifies how the fair market value of the easement shall be determined for this purpose:

> This Easement constitutes a real property interest immediately vested in Grantee, which * * * the parties stipulate to have a fair market value determined by multiplying (a) the fair market value of the Property unencumbered by this Easement (minus any increase in value after the date of this grant attributable to improvements) by (b) a fraction, the numerator of which is the value of this Easement at the time of the grant and the denominator of which is the value of the Property without deduction of the value of this Easement at the time of this grant. * * * For purposes of this Section, the ratio of the value of this Easement to the value of the Property unencumbered by this Easement shall remain constant.[] It is intended that this Section 9.2 be interpreted to adhere to and be consistent with * * * [section] 1.170A-14(g)(6)(ii)[, Income Tax Regs].

When the easement was granted, the improvements to the Property included 20 natural gas wells, two cell phone towers, various roads, and various electricity installations. Section 4.4 of the Easement Deed reserves to Coal Holdings the right to provide utilities to any permitted structure through underground lines, pro-

vided that "any utilities supplied to the structures located on the Property at the time of this Easement by overhead lines shall be permitted to remain in place." Section 4.14 reserves to Coal Holdings the right "to install and maintain roads and/or driveways for vehicular access to areas of the Property on which the existing and additional structures and related ancillary improvements are and may be constructed."

D.    Coal Holdings' Tax Return

Coal Holdings timely filed Form 1065, U.S. Return of Partnership Income, for its taxable year ending December 31, 2013.  On that return it claimed a charitable contribution deduction of $155.5 million for its donation of the easement.  It allocated this deduction among its partners in proportion to their respective capital and profits interests, as follows:

| | |
|---|---|
| Coal Land Manager, LLC (.01%) | $15,550 |
| Lindsay Land (1%) | 1,555,000 |
| LCV Fund XII (98.99%) | 153,929,450 |
| Total | 155,500,000 |

Coal Holdings included with its return a copy of an appraisal that relied on the "before and after method" to value the easement.  See sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.  The appraisal concluded that the highest and best use of the 3,713 acres, unencumbered by the easement, would be "an owner operated

coal mining operation." It reasoned that the "most viable and reasonable option" would be a subsurface mine that would access the coal seams through the adjacent Goodman Property. A technical report appended to the appraisal concluded that, because most of the Property was "very sparsely populated, the potential social consequences of the surface effects of underground mining, especially from mine subsidence, are minimal for room-and-pillar mining." Employing a discounted cashflow analysis, the appraisal concluded that the Property had a "before value" of approximately $160.5 million as a "conceptual mining operation."[3]

In determining the Property's "after value" the appraisers assumed that "the restrictions, as imposed by the easement, will not permit any subsequent development nor coal mining" on the 3,713 conserved acres. The appraisal accordingly concluded that the highest and best use of the Property after imposition of the easement would be for agricultural and recreational purposes. After considering four regional sales of unencumbered rural property deemed comparable, the appraisers determined a value of $1,300 per acre, which yielded a rounded value of $5 million for the entire Property. Subtracting the "after" value from the "before" value, the appraisal determined a value of $155.5 million for the easement.

---

[3]For purposes of calculating the "before" and "after" values, the appraisal ignored income from the natural gas wells because of "the relatively small amount of income generated."

Coal Holdings included with its return Form 8283, Noncash Charitable Contributions. Form 8283 directs the taxpayer to provide the IRS with certain information regarding contributions of this sort. When a taxpayer donates property (other than publicly traded securities) valued in excess of $5,000, the taxpayer must provide: (1) a description of the donated property, (2) a brief summary of its physical condition, (3) its appraised fair market value, (4) the date the property was acquired by the donor, (5) the manner of acquisition, and (6) the donor's cost or adjusted basis. The instructions to Form 8283 state that "[i]f you have reasonable cause for not providing the information * * *, attach an explanation so your deduction will not automatically be disallowed."

In the relevant boxes on the Form 8283, Coal Holdings claimed a deduction of $155.5 million and reported $5 million as "Donor's cost or adjusted basis." In box 5(e) it stated that it had acquired the Property by "purchase," whereas it had actually acquired the Property by contribution. Box 5(d), which directs the taxpayer to supply the date on which the property was acquired, was left blank. These omissions were not cured by the supplemental statement that Coal Holdings appended to the Form 8283. However, the appraisal included with the return recited, in a section captioned "History and Ownership," that the 3,713 acres "were

conveyed to Coal Property Holdings, LLC by a Quit Claim Deed from Lindsay Land, LLC, recorded September 23rd, 2013."

E.     IRS Examination

The IRS selected Coal Holdings' 2013 return for examination. On November 4, 2016, the IRS issued an FPAA to Coal Land Manager, LLC, the partnership's TMP. The FPAA disallowed the charitable contribution deduction in full, concluding that "it has not been established that all of the requirements of section 170 * * * have been satisfied for the contribution of property." Alternatively, the FPAA determined that Coal Holdings had failed to establish "that the fair market value of the contributed property interest was $155,500,000 as claimed on the return." The FPAA determined a 40% accuracy-related penalty under section 6662(h) (applicable in the case of a "gross valuation misstatement") and in the alternative a 20% penalty under other provisions of section 6662. Petitioner timely petitioned for readjustment of partnership items under section 6226. See sec. 6226(a), (d).

F.     Questions Presented

In August 2018 respondent moved for partial summary judgment, and several rounds of briefing ensued. Respondent urges that the charitable contribution deduction should be disallowed as a matter of law on three alternative grounds.

He first contends that Coal Holdings failed to "[a]ttach a fully completed appraisal summary" to its return, as the regulations require. See sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs. On the Form 8283, Coal Holdings left the "Date acquired by donor" box blank and (in respondent's view) gave a misleading description of how it acquired the Property. Cf. RERI Holdings I, LLC v. Commissioner, 149 T.C. 1, 16-17 (2017) (finding Form 8283 noncompliant because it failed to disclose cost or adjusted basis), aff'd sub nom. Blau v. Commissioner, 924 F.3d 1261 (D.C. Cir. 2019); Belair Woods, LLC v. Commissioner, T.C. Memo. 2018-159 (same).

Second, respondent contends that the $155.5 million valuation was predicated on the erroneous assumption that the Easement Deed categorically prohibits all mining on the Property. Although the Easement Deed prohibits surface mining, respondent interprets it to allow subsurface mining unless, "in the reasonable discretion of Grantee," such activity "would significantly impair or interfere with * * * the Conservation Purposes." Because the technical report appended to the appraisal opines that "the potential social consequences of the surface effects of underground mining * * * are minimal," respondent contends that the Conservancy would have no reasonable basis to object to properly conducted subsurface mining. Asserting that the highest and best use of the Property is thus the same on

a "before" and "after" basis, respondent concludes that petitioner has not established for the easement a value greater than zero.

Third, respondent contends that the conservation purposes are not "protected in perpetuity," sec. 170(h)(5)(A), because the Easement Deed fails to comply with the regulations governing judicial extinguishment. Those regulations provide that, in the event the easement is extinguished and the property is sold, the charitable grantee must be entitled to a proportionate share of the proceeds, as defined by formula. Sec. 1.170A-14(g)(6)(i) and (ii), Income Tax Regs. Concluding as we do that respondent is entitled to summary judgment on this third ground, we find no need to address his other arguments at this stage of the case.

## Discussion

A.    Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant partial summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). The parties agree on all material facts relating to whether the Easement Deed complies with the judicial extinguishment provisions

of the governing regulation.  We conclude that this issue is appropriate for summary adjudication.

B.      Statutory and Regulatory Framework

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year.  If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time the gift is made.  See sec. 1.170A-1(c)(1), Income Tax Regs.

The Code generally restricts a taxpayer's charitable contribution deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property."  Sec. 170(f)(3)(A).  But there is an exception to this rule for a "qualified conservation contribution."  Sec. 170(f)(3)(B)(iii).  This exception applies where:  (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the contribution is "exclusively for conservation purposes."  Sec. 170(h)(1).

Section 170(h)(5)(A) provides that a contribution will not be treated as being made exclusively for conservation purposes "unless the conservation purpose is protected in perpetuity."  The regulations interpreting this provision recognize that "a subsequent unexpected change in the conditions surrounding the [donated]

property * * * can make impossible or impractical the continued use of the property for conservation purposes." Sec. 1.170A-14(g)(6)(i), Income Tax Regs. Despite that possibility, "the conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding" and the easement deed ensures that the charitable donee, following sale of the property, will receive a proportionate share of the proceeds and use those proceeds consistently with the conservation purposes underlying the original gift. Ibid. In effect, the "perpetuity" requirement is deemed satisfied because the sale proceeds replace the easement as an asset deployed by the donee "exclusively for conservation purposes." Sec. 170(h)(5)(A).

Section 1.170A-14(g)(6)(i), Income Tax Regs., provides that the donee must be entitled to proceeds "determined under paragraph (g)(6)(ii)." That paragraph, captioned "Proceeds," provides in part as follows:

> [F]or a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift bears to the value of the property as a whole at that time. * * * For purposes of this paragraph * * * , that proportionate value of the donee's property rights shall remain constant. Accordingly, when a change in conditions gives rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, ex-

change, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds * * *

In this case neither party contends that Coal Holdings would be entitled to the full proceeds under applicable State law.

The courts have described this regulation as creating "a single--and exceedingly narrow--exception to the requirement that a conservation easement impose a perpetual use restriction" on real property. Belk v. Commissioner, 774 F.3d 221, 225 (4th Cir. 2014), aff'g 140 T.C. 1 (2013). The requirements of this regulation "are strictly construed." Carroll, 146 T.C. at 212. If the charitable grantee "is not absolutely entitled to a proportionate share of extinguishment proceeds, then the conservation purpose of the contribution is not protected in perpetuity." Ibid.

In Carroll we upheld the disallowance of a charitable contribution deduction where the easement did not satisfy these requirements. As we noted, the regulation requires the grantee's proportionate share upon extinguishment of a conservation easement to be a percentage determined by a fraction, the numerator of which is "the fair market value of the conservation easement on the date of the gift," and the denominator of which is "the fair market value of the property as a whole on the date of the gift." Id. at 216. In Carroll, the easement deed provided

that the numerator would instead be "the deduction for federal income tax purposes allowable by reason of this grant." Id. at 217. As we explained, the charitable contribution deduction allowable could be considerably lower than the fair market value of the easement--indeed, could be as low as zero--if the IRS disallowed the deduction on grounds unrelated to valuation. See id. at 218 n.13. Thus, because the charitable grantee was not guaranteed "a proportionate share of extinguishment proceeds based on the fair market value of the conservation easement at the time of the gift," we held that the easement was not a "qualified conservation contribution" eligible for deduction. Id. at 219.

C.    Analysis

1.    Satisfaction of Regulatory Requirements

In Carroll the easement deed failed to satisfy the requirements set forth above because of a defect in the multiplier--i.e., the fraction used to calculate the charity's proportionate share of the proceeds. In this case respondent alleges defects in computation of the multiplicand and the product. These defects may be illustrated by an example.

Assume that the conservation purposes underlying the easement become impossible to achieve, the easement is extinguished in a judicial proceeding, and the Property is sold on December 31, 2030, for $200 million, a price equal to its then

fair market value. The regulations require that the Conservancy "be entitled to a portion of the proceeds" that is "at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift bears to the value of the property as a whole at that time." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs.

The claimed value of the perpetual conservation restriction at the time of the gift was $155.5 million, and the value of the Property as a whole at that time was said to be $160.5 million. Dividing the former by the latter yields a multiplier of 0.96885. Multiplying $200 million by that fraction yields $193,769,470 as the amount of proceeds that the Conservancy must be guaranteed to receive. See ibid.

Under the Easement Deed the Conservancy in this scenario could come up short for two reasons. First, the multiplicand to which the fraction is applied is not the sale proceeds. Rather, the multiplicand as provided in section 9.2 of the Easement Deed is "the fair market value of the Property unencumbered by this Easement"--an amount presumably equivalent to the sale proceeds--"minus any increase in value after the date of this grant attributable to improvements."

On October 17, 2013, when the easement was granted, the improvements to the Property included 20 natural gas wells, two cell phone towers, various roads, and various electricity installations. Section 4.4 reserves to Coal Holdings the right to provide additional utility installations, and section 4.14 reserves to it the

right to "install * * * roads and/or driveways for vehicular access to areas of the Property on which the existing and additional structures and related ancillary improvements are and may be constructed." The "increase in value * * * attributable to improvements" would thus be the sum of: (1) any appreciation between October 17, 2013, and December 31, 2030, in the value of the improvements that existed when the easement was granted, and (2) the fair market value of any new improvements that Coal Holdings made to the Property during that 17-year period.

Assume that the overall "increase in value * * * attributable to improvements" is $10 million as of December 31, 2030. Under section 9.2 of the Easement Deed, that $10 million is subtracted from the sale proceeds (viz., the fair market value of the property when sold) before the apportionment fraction is applied. This would yield $184,081,500 as the Conservancy's tentative share of the proceeds ($190 million × 0.96885).

Second, the Conservancy's tentative share is then adjusted further by section 9.1 of the Easement Deed. It provides that "the amount of the proceeds to which the Grantee shall be entitled * * * shall be the amount determined under section 9.2," but only "after the satisfaction of prior claims." Prior claims against the sale proceeds might be held by the lessees of the oil and gas wells, by the operators of the cell phone towers, or by other persons holding claims against Coal

Holdings according to section 4.11 of the Easement Deed ("The rights of those in possession of those wells and towers predate this Easement."). Assume that $3 million is paid on December 31, 2030, to satisfy prior claims. The net proceeds for the Conservancy would thus be reduced to $181,081,500--about $12.7 million less than the $193,769,470 that the regulation would dictate, on the facts we have assumed, to be the amount of proceeds to which the Conservancy must be entitled. See sec. 1.170A-14(g)(6)(ii), Income Tax Regs.

The requirements of this regulation "are strictly construed." Carroll, 146 T.C. at 212. In this case, as in Carroll, the charitable grantee "is not absolutely entitled to a proportionate share of * * * [the] proceeds" in the event the Property is sold following judicial extinguishment of the easement. Ibid. We accordingly conclude here, as we did there, that the charitable contribution deduction must be denied in its entirety because "the conservation purpose of the contribution is not protected in perpetuity." See ibid.

This conclusion derives strong support from the recent opinion of the Fifth Circuit in PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 207 (5th Cir. 2018). The easement deed there provided that the charitable grantee would receive, in the event of a sale following judicial extinguishment of the easement, "a defined share of the amount of proceeds remaining" after deduction of selling

expenses and the "amount attributable to improvements constructed upon the Conservation Area pursuant to" the grantor's reserved rights.  Ibid.  The Fifth Circuit held that the charitable contribution deduction was properly denied because of noncompliance with the "judicial extinguishment" regulation:

> [T]he plain language [of the regulation] states that upon judicial extinguishment, the donee "must be entitled to a portion of the proceeds at least equal to * * * [the] proportionate value [as defined in the regulation]." * * *  The ordinary meaning of "proceeds" is "the total amount brought in" * * * .  The regulation does not indicate that any amount, including that attributable to improvements, may be subtracted out.  The word "must" clearly mandates that the donee receive at least the proportionate value * * * of the "proceeds." * * *  Accordingly, as * * * [the easement deed] permits the deduction of the value of improvements from the proceeds, prior to the donee taking its share, the provision fails to meet the requirement set forth in * * * [section] 1.170A-14(g)(6)(ii)[, Income Tax Regs]. * * * [Id. at 207-208; citations omitted.]

The taxpayers in PBBM-Rose Hill filed a petition for panel reconsideration and a petition for rehearing en banc.  They stated that improvements clauses of the sort involved in that case appeared in templates for conservation easement deeds published by the Land Trust Alliance and by many individual land trusts.  By holding such clauses to violate the "judicial extinguishment" regulation, the panel's opinion was said to frustrate the legitimate reliance interests of "countless

taxpayers, land trusts, and conservation agencies."[4]  Without dissent, the Fifth

Circuit denied both petitions for rehearing on December 11, 2018.

    2.    Petitioner's Arguments

Petitioner seems to recognize that one or both of the provisions discussed

above may be problematic under the "judicial extinguishment" regulation.  But it

contends that the Easement Deed contains a "Treasury Regulation override" man-

dating that these provisions be interpreted to conform to the regulatory require-

ments as we have construed them.  We conclude that the text to which petitioner

refers constitutes a "condition subsequent" saving clause, which we and other

courts have consistently declined to enforce.

Section 9.1 of the Easement Deed states that the amount of proceeds to

which the Conservancy shall be entitled, "after the satisfaction of prior claims,

* * * shall be the stipulated fair market value of this Easement * * * as determined

in accordance with Section 9.2 or * * * Section 1.170A-14, if different from Sec-

---

[4]The Land Trust Alliance and others have advanced similar arguments in amicus curiae briefs filed in this Court in cases presenting the question we address here.  See, e.g., Red Oak Estates, LLC v. Commissioner, T.C. Dkt. No. 13659-17; Cottonwood Place, LLC v. Commissioner, T.C. Dkt. No. 14076-17; Belair Woods, LLC v. Commissioner, T.C. Dkt. No. 19493-17; Englewood Place, LLC v. Commissioner, T.C. Dkt. No. 1560-18; Maple Landing, LLC v. Commissioner, T.C. Dkt. No. 1996-18; Riverside Place, LLC v. Commissioner, T.C. Dkt. No. 2154-18; Village at Effingham, LLC v. Commissioner, T.C. Dkt. No. 2426-18.

tion 9.2" (emphasis added). Section 9.2 states: "It is intended that this Section 9.2 be interpreted to adhere to and be consistent with * * * Section 1.170-14(g)(6)(ii)" of the regulations. Section 17.2 of the Easement Deed, captioned "Liberal Construction," states that "this Easement shall be liberally construed in favor of the grant * * * to qualify as a qualified conservation contribution."

We conclude that section 9.1 of the Easement Deed embodies a "condition subsequent" saving clause because it purports to countermand the plain text of the Easement Deed in the event of a future adverse occurrence. Section 9.1 requires that the Conservancy's share of the proceeds be determined under the formula set forth in section 9.2, unless that formula is "different from" the requirements of section 1.170A-14(g)(6), Income Tax Regs. The improvements clause in section 9.2 grants Coal Holdings valuable property rights; indeed, the value of those property rights would be $9.7 million on the facts we have hypothesized. See supra pp. 21-22. The only circumstance in which the regulation could be determined to require a calculation "different from" section 9.2, in derogation of Coal Holdings' property rights, would be if some tribunal, State or Federal, authoritatively so held. The clear effect of section 9.1 is thus to cancel the literal requirements of section 9.2 in the event the latter are determined to be

noncompliant. Section 9.1 thus constitutes a "condition subsequent" saving clause.

The courts have consistently declined to enforce such provisions. In Belk, the easement deed permitted the parties, by amending that document, "to swap land in and out of the Easement." Belk, 774 F.3d at 223. The Fourth Circuit, affirming this Court, held that this right of substitution violated the "granted in perpetuity" requirement of section 170(h)(2)(C). See id. at 225-227. The taxpayers sought to rescue their deduction by relying on a saving clause in the easement deed. It provided that the charitable grantee "shall have no right or power to agree to any amendments * * * that would result in this Conservation Easement failing to qualify * * * as a qualified conservation contribution under [s]ection 170(h)."

The taxpayers in Belk contended that, if the Court of Appeals were to hold (as it did) that section 170(h)(2)(C) barred substitutions of property, the saving clause operated to redeem their deduction by precluding the parties from executing an amendment allowing such substitution. The taxpayers thus argued "that the savings clause negate[d] a right clearly articulated in the Easement--their right to substitute property--but only if triggered by an adverse determination by this court." Belk, 774 F.3d at 228-229.

The Fourth Circuit refused to give effect to this provision. "When a savings clause provides that a future event alters the tax consequences of a conveyance," the court explained, "the savings clause imposes a condition subsequent and will not be enforced." Id. at 229 (citing Commissioner v. Procter, 142 F.2d 824, 827 (4th Cir. 1944)). The taxpayers attempted to distinguish Procter, noting that the saving clause in Procter altered the conveyance "following an adverse IRS determination or court judgment," whereas the saving clause in Belk "d[id] not expressly invoke the IRS or a court." Ibid. The Fourth Circuit found this "a distinction without a difference." Ibid. Because the saving clause purported to alter contract rights, it was triggered by "a determination that c[ould] only be made by either the IRS or a court." Id. at 229-230.

The Fourth Circuit likewise rejected the taxpayers' argument that the saving clause was "simply 'an interpretive clause' meant to ensure the 'overriding intention' of the parties that the Easement qualify as a charitable deduction." Id. at 230. The court found that there existed "no open interpretive question for the savings clause to 'help' clarify," since the reserved right to substitute property was "clear from the face of the Easement." Ibid. If the taxpayers' "overriding intent" had been that the easement qualify under section 170(h), the court suggested, "they would not have included a provision so clearly at odds with the language of §

170(h)(2)(C)." Id. at 230. The court refused to apply the saving clause as the taxpayers wished, ruling that to do so would be "sanctioning the very same 'trifling with the judicial process'" that the court had previously condemned. Ibid. (quoting Procter, 142 F.2d at 827).

We reached a similar conclusion in Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. 380 (2017). That case, like this one, involved a provision in an easement deed governing distribution of proceeds following judicial extinguishment of the use restriction. We held that the provision at issue violated the "protected in perpetuity" requirement of section 170(h)(5)(A) because banks holding mortgages against the conserved property were given preferential claims-- prior to the lien held by the grantee organization--to any proceeds received from condemnation. See id. at 398 (citing section 1.170A-14(g)(6)(ii), Income Tax Regs.).

The taxpayer argued that, if we were to find this provision not in compliance with the regulation, the easement deed contained "a saving clause that would apply to retroactively reform the Deed to comply with the regulations." Id. at 404. The paragraph governing judicial extinguishment in that case stated:

> It is the intention of Grantor that the provisions of this Paragraph 19 comply with all applicable requirements of the Income Tax Regulations governing qualified conservation contributions, particularly

* * * the requirements of Section 1.170A-14(g)(6) thereof.  In the event that any of the provisions of this Paragraph 19 conflict or are inconsistent with * * * such Regulations, they shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency and to bring them into full compliance with such regulations * * * [Id. at 387; emphasis omitted.]

We held that the taxpayer's "attempted use of a saving clause to reform the Deed to comply with the regulation [wa]s not valid." Id. at 405.  "[W]hen a savings clause provides that a future event alters the tax consequences of a conveyance, the savings clause imposes a condition subsequent and will not be enforced." Ibid. (quoting Belk, 774 F.3d at 229); see Estate of Christiansen v. Commissioner, 130 T.C. 1, 13 (2008) (finding a contingent disclaimer ineffective because it "depend[ed] for * * * [its] effectiveness on a condition subsequent"), aff'd, 586 F.3d 1061 (8th Cir. 2009).

Petitioner urges that the text on which it relies does not constitute an impermissible saving clause but rather sets forth a "permitted interpretation provision." Petitioner urges that section 1.170A-14(g)(6), Income Tax Regs., is ambiguous--or at least was ambiguous when the Easement Deed was executed in 2013--because a 2008 IRS private letter ruling appeared to permit adjustment of post-judicial-extinguishment proceeds to reflect appreciation in the value of improvements.  See Priv. Ltr. Rul. 200836014 (June 3, 2008).  According to petitioner, section 9.1 and

9.2 of the Easement Deed took account of this regulatory ambiguity and supplied an "interpretation directive" designed to ensure that the Conservancy would receive in all events whatever proceeds the regulation was ultimately interpreted to mandate.

We are not persuaded. The taxpayer in PBBM-Rose Hill brought the same IRS private letter ruling to the Fifth Circuit's attention, but that court paid no heed to it, finding the regulation unambiguous on its face. See PBBM-Rose Hill, 900 F.3d at 208. The Fourth Circuit in Belk similarly found the property substitution provision of the easement deed to be unambiguous. It accordingly rejected the taxpayer's effort to characterize the saving clause as "simply 'an interpretive clause' meant to ensure the 'overriding intention' of the parties" that the easement qualify for a tax deduction. Belk, 774 F.3d at 230.

We agree with both Courts of Appeals. Section 1.170A-14(g)(6)(ii), Income Tax Regs., plainly requires that the charitable grantee be guaranteed to receive, upon a sale following judicial extinguishment of the easement, its full proportionate share of the sale proceeds. Section 9.2 of the Easement Deed violates this requirement by providing that Coal Holdings will receive all of the sale proceeds to the extent those proceeds are attributable to appreciation in the value of improvements. This provision creates valuable property rights in Coal Holdings.

The saving clause purports to override section 9.2's plain terms, in derogation of Coal Holdings' property rights, in the event the requirements of the governing regulation are determined to be "different from" those of section 9.2. Contrary to petitioner's view, this text cannot be characterized as an "interpretation directive" or an "interpretational aid" because there is nothing that needs interpretation; the terms of section 9.2 are clear and unambiguous. As in Belk, there is "no open interpretive question for the savings clause to 'help' clarify." Belk, 774 F.3d at 230. Rather than interpreting an ambiguous provision, the text to which petitioner refers purports to countermand the effect of an unambiguous provision, but only in the event of an adverse future occurrence. This is a classic "condition subsequent" saving clause, and we decline to give it effect. See Palmolive Bldg. Inv'rs, LLC, 149 T.C. at 405; cf. Estate of Cline v. Commissioner, T.C. Memo. 1982-90, 43 T.C.M. (CCH) 607, 609-610 (1982) (giving effect to a provision that clarified "ambiguous * * * language in a poorly drafted prenuptial agreement," as opposed to being "a savings clause that would undertake to change the property interests otherwise created").

Finally, even if the saving clause were thought capable of overriding the improvements clause of section 9.2, petitioner faces a distinct problem in section 9.1. It provides that "[t]he amount of the proceeds to which the Grantee shall be

entitled, <u>after the satisfaction of prior claims</u>, * * * shall be the stipulated fair market value of this Easement," as determined under section 9.2 or (if different) the governing regulation. The Conservancy's share of the proceeds would thus be reduced by any amounts paid in satisfaction of prior claims--e.g., claims against Coal Holdings by the oil and gas lessees or cell tower operators--even if the easement's fair market value were determined exactly as the regulation requires. The Easement Deed thus manifests the same defect as the easement deed in <u>Palmolive</u>, where banks holding mortgages against the conserved property were granted preferential claims--before the lien held by the grantee organization--to any proceeds received from condemnation. <u>See</u> <u>Palmolive Bldg. Inv'rs, LLC</u>, 149 T.C. 398. We held in <u>Palmolive</u> that the conservation purpose for that reason was not "protected in perpetuity," sec. 170(h)(5)(A), and the same conclusion would follow here.[5]

---

[5]Petitioner discerns no fault in the "prior claims" provision, asking rhetorically: "How else would prior claims be addressed?" It is not necessarily unreasonable for a deed to provide that prior claims may be paid from sale proceeds. What is unreasonable, and what violates the "judicial extinguishment" regulation, is the requirement of section 9.1 that <u>all</u> prior claims be paid out of <u>the Conservancy's share</u> of the proceeds, even if those claims represent liabilities of Coal Holdings.

To reflect the foregoing,

An order will be issued granting respondent's motion for partial summary judgment.